Present:   All the Justices

TERRICK D. BARNES

v.  Record No. 090339                    OPINION BY
                        CHIEF JUSTICE LEROY ROUNTREE HASSELL, SR.
COMMONWEALTH OF VIRGINIA           January 15, 2010

FROM THE COURT OF APPEALS OF VIRGINIA

I.

In this appeal from the Court of Appeals, the primary issue we consider is whether a search warrant affidavit satisfied the probable cause requirement established by the United States Supreme Court in Franks v. Delaware, 438 U.S. 154 (1978).

II.

Terrick D. Barnes was indicted by a grand jury in the Circuit Court of the City of Alexandria for the unlawful, felonious and malicious shooting of Henry Carmon in violation of Code § 18.2-51.2 and for the unlawful and felonious use and display of a firearm while committing an aggravated malicious wounding in violation of Code § 18.2-53.1.

During a pretrial hearing, Barnes filed a motion to suppress certain evidence that had been seized from his home pursuant to a search warrant.  Barnes asserted that the evidence should be suppressed because purportedly the affidavit in support of the search warrant was insufficient to establish probable cause and allegedly the affidavit contained incomplete

and "recklessly omitted" information that negated probable cause.

Upon the conclusion of a pretrial evidentiary hearing on this issue, the circuit court, among other things, denied Barnes' motion to suppress. At a bench trial, the circuit court convicted Barnes of the charged offenses. The circuit court fixed Barnes' punishment at twenty years imprisonment, with eight years suspended for the aggravated malicious wounding conviction, and three years imprisonment for the use of a firearm conviction.

Barnes appealed his convictions to the Court of Appeals, which affirmed the convictions in an unpublished opinion. Barnes v. Commonwealth, No. 2314-07-4 (Dec. 9, 2008). Barnes filed a petition for rehearing en banc, which was denied. Barnes v. Commonwealth, No. 2314-07-4 (Jan. 15, 2009). Barnes appeals.

### III.

**Facts Adduced During the Evidentiary Hearing on the Motion to Suppress Evidence Seized Pursuant to the Execution of the Search Warrant**

On June 12, 2006, Henry Carmon encountered the defendant sometime during the day at a food facility operated by the Salvation Army. Carmon spoke with the defendant and said:

2

"[H]ow [are] you doing, young man?"  The defendant replied:

"[Y]ou know what you did."

Approximately 10:00 p.m. on the night of June 12, 2006, Carmon left his home en route to a convenience store to "bum a cigarette."  Carmon testified that as he was walking to the store, "[the defendant] was there waiting on me."

The defendant, using a 9 millimeter pistol, fired five bullets at Carmon and one bullet struck Carmon in his hip. Carmon was able to clearly see the defendant's face when the defendant shot Carmon.  Carmon gave the following testimony during the pretrial hearing:

> "Question: . . . Were you able to see [the defendant's] face when he shot you?
> "Answer: Yes, I did.
> "Question: How close to you was he, when he shot you?
> "Answer: We were close up, . . . his face was in my face.
> "Question: Were you walking when you passed each other?
> "Answer: Yes.
> "Question: Were you on the street or the sidewalk?
> "Answer: We was on the sidewalk.
> "Question: The same sidewalk?
> "Answer: Yes.
> "Question: Do you remember what he was wearing?
> "Answer: Only thing I know was he had a white sweater on.  He was trying to cover his face up.
> "Question: What did he look like?
> "Answer: He's dark and . . . his mustache comes down this way and his hair is kind of short.
> "Question: When you say[, ']the mustache coming down this way[,'] are you talking about a go-tee or like a fu-man-chu style mustache?
> "Answer: Yes."

3

Detective Robert Hickman, of the Alexandria Police Department, was working on the night of June 12, 2006, and was assigned to investigate these crimes. He interviewed Carmon the night he was admitted to a hospital for treatment. Carmon told Detective Hickman that the assailant was a dark black male in his twenties or thirties, five feet four inches to five feet six inches tall, and very skinny with a mustache that "drooped down to his chin." Carmon also informed Hickman that the assailant was wearing a "white hooded shirt."

Detective Hickman created a "photograph-spread" and showed it to Carmon at the hospital. The photograph-spread contained a picture of Barnes that was taken in 2002. Detective Hickman did not use a photograph that was taken of Barnes on the night of the crimes because Hickman was concerned that the photograph may be suggestive since Barnes was wearing a white shirt. Carmon failed to identify Barnes as the assailant when Carmon reviewed the photograph-spread that contained the 2002 photograph of Barnes.[*] Several months later, however, Carmon

---

[*] The circuit court concluded it was not surprised that Carmon failed to identify the defendant in the photograph-spread. The court commented:

> "Well, this one [photograph taken in 2002] was when the [defendant] was four years younger and at that time, he had longer hair, had some . . . kind of pig-tails hanging down and a whole lot greater go-tee than what appears in the actual line-up picture. In addition to that, the witness described the [d]efendant as being dark or his assailant as being dark, and with the lighting on

4

identified Barnes as his assailant during a line-up at a jail.

Barnes, who had fled the scene of the crimes, later returned to the crime scene that same night. Detective Hickman saw Barnes at the scene of the shooting upon Barnes' return. Barnes spoke with another police officer, Richard Sandoval, and voluntarily accompanied Officer Sandoval to a police station. The police officers were concerned on the night of the crimes that they may not have probable cause to obtain a search warrant of the defendant's home so they requested his permission to conduct a search of his house. Barnes refused.

The detectives continued their investigation. Detective Hickman learned that Lisbeth Lyons, who was in the area when the shooting occurred, saw a man leave the scene of the shooting. She described an individual who fit the defendant's description. Eventually, Detective Hickman prepared an affidavit to obtain a search warrant for the defendant's house. The affidavit in support of a search warrant is attached to this opinion as Exhibit A.

Detective Hickman also learned, during his investigation, that several patrons at a restaurant saw the defendant after the shooting "conceal himself from gentlemen nearby who were living in a truck." Detective Hickman stated in the search

the [d]efendant in [the] photograph . . . , he looks almost white-skinned he's so light, obviously because of

5

warrant affidavit that the defendant sought to conceal himself after the shootings.

After Barnes shot the victim, several individuals who were "standing nearby" spoke with Detective Hickman and another police officer. These individuals stated that they saw a person, with a physical appearance different from Barnes' physical appearance in the vicinity after the victim was shot. Detective Hickman did not include this information in the search warrant affidavit.

Detective Hickman testified that according to a police report, another police officer stopped an individual near the scene of the shooting who was wearing a white shirt. However, Detective Hickman did not pursue that individual because he did not match the physical description of the assailant "at all." Detective Hickman noted in the police report, however, that another police officer had stopped an individual wearing a white shirt because that officer thought that the individual may have matched the description of the assailant. This information was not included in the search warrant affidavit.

Detective Hickman testified that generally he neither includes exculpatory information in search warrant affidavits nor intentionally omits information that may be exculpatory from search warrant affidavits. Detective Hickman stated:

---

the light."

6

"I don't put in exculpatory evidence in affidavits. I don't believe that a search warrant affidavit is a complete overview of the entire investigation.

"I believe – the way I complete a search warrant application is, I put in the evidence that rises to a level of probable cause. I don't believe that all evidence needs to be put in, that would give it probable cause."

Detective Hickman sought and obtained the search warrant of the defendant's house four days after the defendant shot the victim. During those four days, Hickman discovered additional facts that he included in the search warrant affidavit. Carmon, the victim, knew the models of the automobiles that the defendant usually drove. Two other witnesses identified the defendant in a photograph-spread, and one witness, Colby Cooper, told police officers that he saw "the [d]efendant walk up the street and down the street [where the shooting occurred] right at the time of the shooting." Cooper also gave a description of the assailant that is similar to the description that the victim gave to Detective Hickman regarding Barnes.

Detective Hickman also learned that the defendant lived on Price Street. Detective Hickman stated the following in the search warrant affidavit. The victim had previously told Detective Hickman that the assailant lived on Price Street. Another witness confirmed that the defendant's nickname was "Turk" and that Turk lived on Price Street.

7

Detective Hickman showed another witness, Lisbeth Lyons, a photograph-spread, but she was unable to identify the defendant. Detective Hickman did not include that information in the search warrant affidavit. However, two other witnesses, Cooper and Mary McMillan successfully identified the defendant in a photograph-spread and Detective Hickman included this information in the affidavit because he believed "it goes towards probable cause." Detective Hickman testified that every fact that he placed in the affidavit was true.

Upon the conclusion of the pretrial hearing, the defendant asked the circuit court to suppress all items seized pursuant to the execution of the search warrant, including a handgun, a gun magazine, a white shirt, bullets, and ballistic tests that clearly associated the defendant with the shooting.

Rejecting the defendant's motion to exclude the evidence seized from the execution of the search warrant, the circuit court stated:

> "Now, as [the court] understand[s] this [motion], this [Franks] case protects against [o]missions that are designed to mislead or that are made in reckless disregard of whether they would mislead.
> "[The court doesn't] think Detective Hickman made these omissions with the – with a design to mislead. Obviously, he stated that it's just his matter of principle that he doesn't put exculpatory evidence [into] affidavits for search warrants.
> "But it does seem . . . that the omissions were probably made in reckless disregard of whether they would mislead.

"Notwithstanding that, [the court has] reviewed this affidavit very, very, very carefully and . . . [has] reviewed it with an eye toward including the omissions, which [defendant's counsel] has pointed out, and having done that, [the court is] satisfied that the affidavit, plus the omissions, still establishes probable cause for the search that took place."

IV.

A.

Barnes, relying principally upon the United States Supreme Court's opinion in Franks v. Delaware, supra, argues that the search warrant that was executed in his home is void because the circuit court found that Detective Hickman's omissions of material facts in the search warrant "were probably made in reckless disregard of whether they would mislead." Continuing, Barnes asserts that the circuit court erred by ruling that the affidavit for the search warrant established probable cause to search the defendant's house even if the omitted material had been included in the affidavit.

Responding, the Commonwealth contends that the affidavit in support of the search warrant established probable cause and, hence, the requirements of the United States Supreme Court's decision in Franks v. Delaware, supra, have been satisfied. We agree with the Commonwealth.

The United States Supreme Court in Franks v. Delaware, considered the issue whether a defendant in a criminal proceeding ever has the right under the Fourth and Fourteenth

9

Amendments, subsequent to the ex parte issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the issuance of that warrant. The Supreme Court stated the following principles pertinent to the resolution of this issue:

> "In sum, and to repeat with some embellishment what we stated at the beginning of this opinion: There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue."

Id. at 171-72 (footnote omitted).

The United States Court of Appeals for the Fourth Circuit, in United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990),

10

explained, in detail, the Supreme Court's holding in <u>Franks v.</u>

<u>Delaware</u>:

> "In <u>Franks v. Delaware</u>, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that in certain narrowly defined circumstances a defendant can attack a facially sufficient affidavit. The <u>Franks</u> Court recognized a strong 'presumption of validity with respect to the affidavit supporting the search warrant,' 438 U.S. at 171, 98 S.Ct. at 2684, and thus created a rule of 'limited scope,' <u>id.</u> at 167, 98 S.Ct. at 2682. The rule requires that a dual showing be made which incorporates both a subjective and an objective threshold component. In order even to obtain an evidentiary hearing on the affidavit's integrity, a defendant must first make 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.' <u>Id.</u> at 155-56, 98 S.Ct. at 2676-77. This showing 'must be more than conclusory' and must be accompanied by a detailed offer of proof. <u>Id.</u> at 171, 98 S.Ct. at 2684. In addition, the false information must be essential to the probable cause determination: 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.' <u>Id.</u> at 171-72, 98 S.Ct. at 2684-85. The <u>Franks</u> test also applies when affiants omit material facts 'with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.' <u>United States v. Reivich</u>, 793 F.2d 957, 961 (8th Cir. 1986)."

In <u>United States v. Photogrammetric Data Services, Inc.</u>, 259 F.3d 229, 237-38 (4th Cir. 2001), the United States Court of Appeals for the Fourth Circuit once again articulated the principles that we must apply when a defendant asserts that a search warrant is void in violation of <u>Franks v. Delaware</u>, <u>supra</u>:

"An affidavit supporting an application for a search warrant is entitled to a strong presumption of validity. See Franks v. Delaware, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). Consequently, in order to obtain an evidentiary hearing on the integrity of an affidavit, a defendant must make 'a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.' Id. at 155-56, 98 S.Ct. 2674. The 'showing "must be more than conclusory" and must be accompanied by a detailed offer of proof.' United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990)(quoting Franks, 438 U.S. at 171, 98 S.Ct. 2674). 'Mere negligence in recording the facts relevant to a probable-cause determination is not enough.' Id. at 301 (internal quotation marks and alterations omitted).

" '[T]he false information must [also] be essential to the probable cause determination: "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." ' Id. at 300 (quoting Franks, 438 U.S. at 171-72, 98 S.Ct. 2674). Thus, a Franks hearing 'serves to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was misled into believing that there existed probable cause.' United States v. Friedemann, 210 F.3d 227, 229 (4th Cir.), cert. denied, 531 U.S. 875, 121 S.Ct. 180, 148 L.Ed.2d 124 (2000)."

B.

We observe that the circuit court followed an incorrect procedure when that court conducted the Franks hearing. The United States Supreme Court and all circuits of the United States Court of Appeals have held that a defendant is not entitled to a Franks hearing unless the defendant makes a substantial preliminary showing that the affidavit for the search warrant contains deliberately false or recklessly false

12

misstatements or omissions necessary to a finding of probable cause.  See Franks v. Delaware, 438 U.S. at 155-56; see also United States v. Wilburn, 581 F.3d 618, 621 n.1 (7th Cir. 2009); United States v. Sarras, 575 F.3d 1191, 1218-19 (11th Cir. 2009); United States v. Summage, 575 F.3d 864, 873 (8th Cir. 2009); United States v. Fowler, 535 F.3d 408, 415-16 (6th Cir. 2008); United States v. Tate, 524 F.3d 449, 455 (4th Cir. 2008); United States v. Reiner, 500 F.3d 10, 14-15 (1st Cir. 2007); United States v. Martinez-Garcia, 397 F.3d 1205, 1214-16 (9th Cir. 2005); Rivera v. United States, 928 F.2d 592, 604 (2nd Cir. 1991); United States v. Mueller, 902 F.2d 336, 341-42 (5th Cir. 1990); United States v. Owens, 882 F.2d 1493, 1498-99 (10th Cir. 1989); United States v. Calisto, 838 F.2d 711, 714-16 (3rd Cir. 1988).

The Circuit Court of the City of Alexandria failed to require that the defendant establish the requisite substantial preliminary showing and the circuit court improperly proceeded to conduct a Franks hearing.  Even though the Commonwealth does not challenge this unorthodox procedure, circuit courts in this Commonwealth should not conduct a Franks hearing absent the establishment of the requisite substantial preliminary showing.

C.

Pursuant to Franks, before a circuit court conducts an evidentiary hearing, the court is required to "set to one side"

13

the alleged false or reckless information or omission and determine whether the warrant affidavit supports a finding of probable cause before conducting an evidentiary hearing. 438 U.S. at 156. In spite of the improper procedure that the circuit court employed, we nonetheless agree with the circuit court's conclusion that the affidavit for the search warrant in this appeal established probable cause.

We discussed the concept of probable cause in Parker v. Commonwealth, 255 Va. 96, 106, 496 S.E.2d 47, 53 (1998) (quoting Taylor v. Commonwealth, 222 Va. 816, 820-21, 284 S.E.2d 833, 836 (1981)):

> " 'The legal standard of probable cause, as the term suggests, relates to probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons. The presence or absence of probable cause is not to be examined from the perspective of a legal technician. Rather, probable cause exists when the facts and circumstances within the officer's knowledge, and of which he has reasonably trustworthy information, alone are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed. Draper v. United States, 358 U.S. 307, 313 (1959); Schaum v. Commonwealth, 215 Va. 498, 500, 211 S.E.2d 73, 75 (1975). In order to ascertain whether probable cause exists, courts will focus upon "what the totality of the circumstances meant to police officers trained in analyzing the observed conduct for purposes of crime control." Hollis v. Commonwealth, 216 Va. 874, 877, 223 S.E.2d 887, 889 (1976).' "

Additionally, when determining whether an affidavit for the issuance of a search warrant is sufficient to support that warrant, we must consider the totality of the circumstances.

14

Derr v. Commonwealth, 242 Va. 413, 421, 410 S.E.2d 662, 666 (1991); Illinois v. Gates, 462 U.S. 213, 230-31 (1983). And, the search warrant affidavit is presumed to be valid. Franks, 438 U.S. at 171.

Applying the well established aforementioned principles, we hold that the search warrant affidavit in this case is constitutionally permissible and does not contravene the principles established in Franks v. Delaware, supra. The affidavit, which contains the following information, clearly established probable cause. The affidavit informed the magistrate that the victim saw the suspect who shot him (the victim). A witness who resides on the same street as the defendant identified the defendant as the same black male she observed after she was awakened by the "sounds of gunshots." This witness saw Barnes walking, and he had his hand "up over his head." Another witness informed Detective Hickman that Barnes' nickname was "Turk," and the witness identified a photograph of Barnes as the man she saw on the night of the shooting. Another police officer received information from a citizen who advised the officer that a black male was seen running after gunshots occurred. A police officer responded and stopped the defendant, Barnes, who was dressed in a white pullover shirt with a hood. Two other citizens saw Barnes two to three minutes after they heard gunshots and Barnes sought to

15

conceal himself. Certainly, the facts in the affidavit would cause a person of reasonable caution to believe that the defendant had committed the crimes. Parker, 225 Va. at 106, 496 S.E.2d at 53. Thus, the issuing magistrate had a substantial basis for concluding that probable cause existed. Illinois v. Gates, 462 U.S. at 238-39.

## V.

### Sufficiency of the Evidence

#### A.

Applying well established principles of appellate review, we will state the evidence in the light most favorable to the Commonwealth, the prevailing party in the circuit court. McMillan v. Commonwealth, 277 Va. 11, 15, 671 S.E.2d 397, 399 (2009); Bishop v. Commonwealth, 275 Va. 9, 11, 654 S.E.2d 906, 907 (2008); Pruitt v. Commonwealth, 274 Va. 382, 384, 650 S.E.2d 684, 684 (2007). We will only summarize those facts that are germane to the sufficiency of the evidence to establish the defendant's crimes beyond a reasonable doubt.

As we previously stated, Henry Carmon, the victim, encountered the defendant on June 12, 2006, during the day, at a facility operated by the Salvation Army. Later that evening, Carmon left his home around 10:00 p.m. to walk to a convenience store in order to "bum a cigarette."

16

As Carmon was walking, he met the defendant.  Carmon stated that the defendant "was standing there and [that they] faced each other and [the defendant] took his left hand trying to cover his face up.  [The defendant] had a white sweater on.  Then [the defendant] took his right hand and went for the gun."  The defendant removed a gun from his belt, the "waistband area."  Carmon testified that the defendant "shot at [Carmon] five times, but [the defendant] hit [Carmon] one time."  The defendant shot Carmon in his buttock and during the trial, Carmon identified the defendant as the individual who shot him.

After the shooting, Carmon informed Detective Hickman that the defendant was wearing a white shirt, a white sweater, and that he was trying to conceal his face.  Carmon had seen the defendant several times before the defendant shot Carmon.  The defendant attended the same high school as Carmon's stepdaughter.  Carmon knew that the defendant lived on Price Street and had seen the defendant driving a grey or white car and also a "big black car."  Carmon informed Detective Hickman that the defendant's nickname began with the letter 'T'.

Mary McMillan, who lives on Price Street, the same street where the defendant lives, heard a "loud popping noise about five or six times" around 10:00 p.m. on June 12, 2006.  She left her house and walked on her porch to "see what was going on."  She saw the defendant, whose nickname is "Turk," walking

down the street. McMillan identified the defendant as "Turk" during the trial.

Dayna Blumel observed a black male wearing a white shirt on the night of the crimes. She saw him on three occasions. The first time she saw the defendant, he was walking in the street. She observed him again approximately ten to fifteen minutes later. About thirty minutes later, she heard a gunshot and she saw the defendant "briskly walking or a slight jog." Later, she saw the defendant running and she heard sirens from police cars. Dayna Blumel testified that the defendant stopped running and "ducked" when he saw some police officers.

Robert Blumel also observed Barnes on the night of the shootings. Blumel described Barnes as a black male with medium height, slight build, and short hair. Robert Blumel saw Barnes and Blumel heard gunshots. Less than one minute elapsed between the time Robert Blumel heard gunshots and the time he saw the defendant running near the crime scene. Blumel spoke to policemen who were at the crime scene and testified that "[a]s soon as [Blumel] leaned forward and pointed to [the defendant], [the defendant] crouched down and the police got him."

The police officers executed a search warrant of Barnes' residence and found a handgun, magazine, and ammunition. They also seized a white-colored, short-sleeved, hooded sweat top.

18

The semi-automatic handgun, along with the magazine and cartridges, were concealed in a basement area above the ductwork.

Gary C. Arntsen, a firearm examiner employed by the Commonwealth of Virginia in the Fairfax Forensic Laboratory, qualified as an expert witness on the subject of firearms. He testified that the bullets discovered at the scene of the crime had been fired by the defendant's 9 millimeter pistol that was found in his home as the result of the execution of the search warrant. Additionally, bullet cartridges found at the scene of the crime had been expelled by the defendant's pistol, which was in operable condition. A bullet that had been removed from the victim's body had also been fired by the defendant's pistol.

Dr. Hani Seoudi, a surgeon who operated on the victim the night of the shooting, qualified as an expert witness. Dr. Seoudi testified that the bullet from the defendant's pistol damaged the lining of the victim's left hip joint "and that is closest to what [doctors] call traumatic arthritis, which can present in chronic pain and limitation [of] range of motion of the joint." Additionally, Dr. Seoudi testified that as a result of the surgery that he performed on the victim, the victim would have permanent intestinal and abdominal scarring.

Carmon was in the hospital for approximately three weeks as a result of the injuries caused by the assailant. Carmon is unable to walk long distances and to sleep at night. His legs hurt "all the time." He also has scarring as a result of the surgery to remove the bullet from his buttock.

B.

The defendant argues that the Commonwealth failed to establish, beyond a reasonable doubt, sufficient evidence to support his convictions for aggravated malicious wounding in violation of Code § 18.2-51.2 and use of a firearm in the commission of aggravated malicious wounding in Code § 18.2-53.1. Continuing, the defendant asserts that the Commonwealth failed to establish that the victim suffered severe injury with significant and permanent physical impairment as required by Code § 18.2-51.2.

The defendant's arguments are utterly without merit. Without being unduly repetitive, we note that the victim and numerous witnesses identified Barnes as the armed assailant who shot Carmon with a 9 millimeter pistol discovered at Barnes' house. Additionally, Dr. Seoudi testified that the bullet that entered the victim's body damaged the lining of his left hip joint, thereby causing traumatic arthritis. Traumatic arthritis can result in chronic pain and a limitation of the range of motion of that joint. Furthermore, the facts

20

summarized in part V.A. of this opinion clearly demonstrate beyond a reasonable doubt that the Commonwealth introduced sufficient evidence to support the convictions.

## VI.

For the foregoing reasons, we will affirm the defendant's convictions.

<u>Affirmed</u>.

Affidavit in support of Search Warrant

Attachment A

On 06-12-06, at 2213 hours, uniformed police officers from the Alexandria Police Department responded to the 100 block of E. Bellefonte Avenue for the report of a man who had just been shot. Upon their arrival, they found the victim, Mr. Henry Carmon, a 61 year old Alexandria City resident, laying on the ground near the intersection of E. Bellefonte Avenue and Price Street, suffering from an apparent gunshot wound. Mr. Carmon was transported to Fairfax Hospital via helicopter and later medical examination revealed that he had suffered one, possibly two gunshot wounds. One bullet was removed in a surgical procedure and was obtained by your affiant. While on the scene, prior to being transported, the victim told officers that he had seen the suspect around the neighborhood but did not know his name.

On 06-14-06 your affiant interviewed a citizen who resides on Price Street. He stated that on 06-12-06 he was awoken by the sounds of gunshots. He stated that he got out of bed and went and looked out the front window. He stated that it took him one to two minutes to get to the front of the house. He stated that he observed a black male walking south on Price Street with his hand up over his head. He stated he went outside and by then police cars were beginning to arrive. He stated that a few minutes later, he saw the same suspect he had seen earlier, walking north on Price, cursing under his breath. He asked a neighbor he was speaking to if she knew that person's name and she said she did and told him however he could not recall it. Your affiant showed him a photospread that included a photograph of Terrick Barnes and he identified Barnes as being the person he saw.

On 06-14 your affiant interviewed the neighbor who had reportedly known the name of the person walking up Price Street and she stated she knew his nickname was Turk and he lived down near the alley on Price Street. Barnes' residence, 1708 Price, is two town homes in from the alley. Your affiant showed her a photograph of Barnes and asked her if that was the man she knew as Turk. She stated that it was.

Alexandria Police officers report that shortly after arriving at the crime scene, a black male, later identified as Terrick Barnes, 07-24-73, approached officers who were at the crime scene asking what had happened. His identifying information was documented and he was asked to leave the scene.

A short time after that, Alexandria Police officer Richard Sandoval received information from a citizen who advised him that he had seen a black male running on Mt. Vernon Avenue at about the time he heard gunshots. He advised Sandoval that the subject was possibly at the intersection of Mt. Vernon Avenue and E. Howell Avenue. That intersection is two blocks from the scene of the shooting. Sandoval responded there and stopped Terrick Barnes. Mr. Barnes was dressed in a



white pullover shirt with a hood. Your affiant responded to that location and spoke with the citizen as well as his wife and a friend. They reported that they had been sitting outside a restaurant located at Mt. Vernon and Howell when they saw a black male walking back and forth along the sidewalk. They then saw him running northbound on the sidewalk of Mt. Vernon Avenue. They report that two to three minutes later they heard gunshots. They stated that a short time after that, they saw the same suspect walking south along the sidewalk and then crouch down in an effort to conceal himself when he heard voices. They report that the person they saw was the same person (Barnes) who had been apprehended by the police across the street from where they sat.

Terrick Barnes was taken to the Alexandria Police Department's Criminal Investigation Section to be interviewed. Alexandria Police Detectives Hein and Hoffmaster interviewed Barnes. While completing background information on him, he stated that he drives a black Ford Crown Victoria bearing VA: JXY-5780 and also a Chevrolet Caprice station wagon. He stated that he resides at 1708 Price Street, Alexandria, Virginia. He further stated his nickname is Turkey. Mr. Barnes reported that he is 5'7" and 135 pounds.

Your affiant has spoken with the victim several times since the shooting. He reported that he had left his residence on E. Bellefonte Avenue to go and buy cigarettes. He stated that as he was walking North on E. Bellefonte, passing Price Street, a black male passed him. He stated that he turned to look at the black male and the black male shot him. He states that the black male then walked south on Price Street. He states that he does not know the suspect's name but knows he lives on Price Street and drives a big black car, and a station wagon with wood paneling on the sides. He described him as being a black male, in his twenties to thirties, wearing a white shirt with a hood. He described him as 5'4" to 5'6" and very skinny.

Your affiant requests a search of the residence commonly known as 1708 Price Street, Alexandria, Virginia for the aforementioned items. Your affiant believes that these items will corroborate criminal charges against Mr. Barnes. 1708 Price Street is a townhouse located on the west side of Price Street. It is a brick townhome and the numbers 1708 are affixed to the brick on the front of the home.

Your affiant believes that if a search warrant is issued for the aforementioned items, the fruits of the crime will be found.

SW06001057

Detective

_____
Title of Applicant

Robert Hickman

_____
Applicant

Subscribed and sworn before me this day.

June 16, 2006, 4:24p.

_____
Date and Time

_____
Magistrate

**692**