COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Athey and White
Argued at Richmond, Virginia

UNPUBLISHED

ROBERT DEAN KINCAID, JR.

MEMORANDUM OPINION[*] BY
v.      Record No. 1381-22-2      JUDGE KIMBERLEY SLAYTON WHITE
                                  DECEMBER 19, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Claude V. Worrell, II, Judge

Peter S. Frazier (The Frazier Law Firm, P.C., on brief), for
appellant.

David A. Stock, Assistant Attorney General (Jason S. Miyares,
Attorney General; Leanna C. Minix, Assistant Attorney General, on
brief), for appellee.

Following a jury trial, Robert Dean Kincaid was convicted of aggravated maiming

resulting from driving while intoxicated, in violation of Code § 18.2-51.4(B). Kincaid alleges

that the trial court erred in denying his pretrial motions, specifically his motion to suppress his

post-accident admission that he was the driver, his motion to suppress medical records reflecting

his blood alcohol content (BAC), and his motion for a hearing under *Franks v. Delaware*, 438

U.S. 154 (1978). He also alleges that the trial court erred in allowing the Commonwealth's

cross-examination of Kincaid's mother on an unrelated incident where she changed her account

of an alleged assault and battery Kincaid inflicted upon her. For the following reasons, we affirm

the decision of the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

This case arises from a serious single car crash that occurred at approximately 8:30 p.m. on December 2, 2020, on I-64 in Albemarle County, Virginia.  Kincaid and his then girlfriend Casey Haney ("Haney") were the only occupants of the vehicle.  Kincaid and Haney both suffered significant injuries.  Haney became paralyzed below her neck as a result of the crash.

On December 2, 2020, Kincaid and Haney were staying at a hotel in Lynchburg.  At the hotel on that morning, Kincaid began consuming alcoholic drinks that included "Twisted Tea," "Mike's Hard Lemonade," and "Fireball" whiskey.  Haney also consumed alcoholic beverages and amphetamines that day.

Haney requested numerous times during the day that Kincaid take her home, but Kincaid refused.  Instead, Kincaid purchased additional alcohol and drove the pair to a junkyard in Fredericksburg around 10:30 a.m.  Kincaid continued to drink while still at the junkyard.

Kincaid then drove to Charlottesville, with Haney in the passenger seat, to run errands and to get something to eat.  Throughout the day, Kincaid continued to drink Twisted Tea and Mike's Hard Lemonade and consumed twelve to fifteen mini-bottles of Fireball whiskey.  Kincaid disposed of the empty bottles either out the window or on the floor of the vehicle.  Haney testified that Kincaid was the sole driver of the vehicle that day.

After eating, Kincaid drove with Haney in the passenger seat to meet his mother to retrieve a pair of glasses. After Kincaid retrieved his glasses, he still refused to take Haney home. Kincaid started to drive back to the hotel on I-64 and told Haney she could either walk or call someone to pick her up.

Kincaid started to drive erratically, accelerating and changing lanes quickly. He said to Haney, "[F]uck you, I'll kill us both. I'll drive into a tree and kill us both." Haney estimated Kincaid was driving at 70 to 80 m.p.h. She thought Kincaid "was doing it to scare [her]." Haney was not wearing her seatbelt and "duck[ed] down in the seat and cover[ed] [her] eyes and ask[ed] him to stop." Haney testified that was the last thing she remembered before waking up at the University of Virginia (UVA) hospital on December 12, 2020, realizing that she was paralyzed from the neck down.

Firefighters found Haney in the front passenger seat of the vehicle and Kincaid in the driver's seat. Emergency personnel removed the roof from the vehicle to extract Kincaid and Haney from inside. During transportation, Kincaid answered basic questions about his name, date of birth, and address.

Trooper John Wukich arrived at the scene after Kincaid and Haney had been removed from the vehicle and transported for medical care. Trooper Wukich smelled alcohol emanating from the vehicle and saw empty mini-bottles of Fireball, an empty Mike's Hard Lemonade can, and an empty Twisted Tea can inside the vehicle. The trooper determined that the vehicle was registered to Kincaid. He testified that he went to the hospital to speak to Kincaid after he learned from the first responders that the male was extracted from the driver's side and the female was extracted from the passenger's side.

At the hospital, a nurse directed Trooper Wukich to a room where Kincaid was in a hospital bed receiving medical care. The only other person in the room was Kincaid's mother.

The trooper observed that Kincaid had bloodshot and glassy eyes and that he smelled like alcohol. He asked Kincaid if he was driving the vehicle when it crashed. Kincaid nodded yes and groaned "uh-huh," which Trooper Wukich interpreted as Kincaid indicating that he was driving the vehicle. Trooper Wukich asked Kincaid if he was wearing his seatbelt, to which Kincaid shrugged his shoulders. Realizing that Kincaid was in pain, the trooper concluded the interview.

Trooper Wukich testified that he returned to the hospital on December 6, 2020, to speak to Kincaid. Kincaid was alone in his room in the intensive care unit. He again asked Kincaid if he was driving the vehicle on the night of the crash, to which Kincaid replied "yes." Trooper Wukich then asked Kincaid "if he had consumed alcohol before or after the crash and if he was on any medication." Kincaid responded by stating, "no." Finally, he asked Kincaid if he had been wearing a seatbelt to which Kincaid shrugged his shoulders. The trooper concluded his questioning.

Kincaid's medical records, released pursuant to a search warrant obtained by Trooper Wukich, revealed that at 9:15 p.m. on December 2, 2020, his blood alcohol concentration was either .15 or .188 per deciliter depending on the type of blood alcohol test performed.

Haney testified at trial that Kincaid was driving the vehicle when it crashed. She also testified that, following the crash, Kincaid was apologetic to her, but that he also stated to her that she had jerked the steering wheel prior to the crash. In addition, she stated that Kincaid claimed that something in the road had obstructed his driving resulting in the crash. Haney and Kincaid ended their relationship in April or May 2021.

Kincaid's mother, Theresa Kincaid ("Theresa"), testified for the defense that Kincaid was driving the vehicle when he and Haney arrived to retrieve Kincaid's glasses, but that Haney drove the vehicle away with Kincaid in the passenger seat. Theresa testified that she did not

observe that Kincaid was intoxicated and that she thought Haney looked "out of it." Theresa further testified that Kincaid complained of severe pain in his leg and his back while at the hospital on December 2, 2020, and that he was unable to speak.

Theresa, during cross-examination by the Commonwealth, admitted that she was convicted of filing a false police report regarding "a certain event involving [her] son." After the prosecutor played a portion of a 911 call where Theresa identified herself, she eventually admitted that she gave information to a law enforcement officer and stated that "Robbie needs to go back to jail."[1] An assault and battery charge and a protective order had been initiated against Kincaid based on that incident. Theresa later altered her complaint and told police that she did not want to press charges against her son. Theresa claimed that she did not know about, nor did she request, a protective order against Kincaid.

At trial, Kincaid acknowledged that he had purchased a 12-pack of miniature Fireball bottles, two cans of Twisted Tea, and a can of Mike's Hard Lemonade on December 2, 2020. He admitted that he drank throughout the day, including eight Fireball bottles and a can of Twisted Tea. Kincaid testified that he asked Haney to drive after they retrieved his glasses from his mother. Kincaid claimed that Haney was driving them back to their hotel when she became upset with him and crashed the vehicle. Kincaid testified that he did not remember speaking with the trooper on December 2 or December 6, 2020. Kincaid denied that he had told Haney that she had "jerked" the wheel.

### Suppression Motions and Hearing

Kincaid, through counsel, filed a pretrial motion to suppress statements that he made to Trooper Wukich on December 2 and December 6, 2020. Kincaid claimed that his statements

---

[1] Although a portion of the 911 call was played for the jury, it was not admitted into evidence at the trial court nor is it a part of the appellate record. Nothing in the transcript sets forth what was played for the jury.

were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his statements were rendered involuntary by his medical condition at the time of the interviews.

Kincaid also moved to suppress his blood toxicity results from the night of December 2, 2020, that Trooper Wukich had obtained through a search warrant for Kincaid's medical records at the UVA hospital. Kincaid asserted that he was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154, on the ground that the trooper made a material misrepresentation and a material omission in the affidavit for the search warrant for the medical records.

At the pretrial suppression hearing, Trooper Wukich's testimony was similar to his trial testimony. He testified that he responded to a single vehicle crash on I-64 in Albemarle County on December 2, 2020, arriving at the scene of the crash at 9:09 p.m. An EMS worker specifically advised the trooper that the male driver of the vehicle and the female passenger had been transported to the UVA hospital. Trooper Wukich testified that he determined the car was registered to Kincaid.

The trooper stated that he arrived at the UVA hospital to speak to Kincaid and Haney at 11:49 p.m. He learned that Haney was unconscious. Trooper Wukich was led to Kincaid's hospital room by hospital staff. There he found that Kincaid was awake, still in his own clothes, and lying in a bed with a neck-brace on. Kincaid was in the general admission area of the Emergency Room, where his room was partitioned by a curtain. Kincaid's mother was present in the room when the trooper first arrived. No one was in Kincaid's room performing any medical procedures or checking any of his vital signs.

Trooper Wukich first asked Kincaid "if he was the driver of the vehicle" that crashed that night. Trooper Wukich described Kincaid's response as "uh-huh" and noted that Kincaid "nodded his head but he could not really nod . . . since he was in that neck brace. He was very constrained [in] his range of motion." Trooper Wukich understood Kincaid's response as an

affirmative one to his question.  He testified that he then asked Kincaid if he was wearing his seatbelt, to which Kincaid did not respond.  Trooper Wukich testified that he concluded the interview because Kincaid appeared to be in pain and was responding by making sounds that were "just moaning and groaning."  He testified that he was in the room for five minutes.

Trooper Wukich returned to the UVA hospital on December 6, 2020, after medical staff advised him that Kincaid was awake and alert.[2]  He testified that at that time, Kincaid was recovering in a room in the intensive care unit.  Kincaid's leg was raised and held in place with a sling attached to the ceiling.  Kincaid appeared immobile and was in a "chest cast."  There were no medical staff nor family members present during the interview on December 6.

Trooper Wukich testified to the following about his interview with Kincaid:

> I asked him again if he was the driver of the vehicle.  He stated yes to me.  I also asked if he was wearing a seatbelt and he shrugged when I asked him that question.  I also asked him the question about did he have anything to drink before or after the crash and he stated . . . no.

Kincaid did not appear to the trooper to be in pain at the short interview on December 6.  Trooper Wukich testified that he was "sure [Kincaid] was on medication but he was very coherent when I was talking to him."  He testified that Kinkaid's responses came immediately following his questions and that the responses were appropriate for the questions asked.  The trooper estimated that their conversation lasted for "five, ten minutes."

At both interviews, the trooper was in uniform and had his badge and firearm displayed.  Neither Kincaid nor anyone else, including medical care providers, asked Trooper Wukich to stop either interview.  The trooper did not handcuff Kincaid, make physical contact with Kincaid, or advise him that he was under arrest at either interview.  No other law enforcement

---

[2] Kincaid underwent surgery and was placed in a medical coma at some point in between the December 2 and December 6 visits by Trooper Wukich.

officers were present inside or outside the room at either interview. Trooper Wukich testified that he questioned Kincaid in order to complete the crash report.

At the hearing, Kincaid presented testimony from his mother, Theresa, who testified that Kincaid was "incoherent" on December 2 and December 6. She indicated that her son was often heavily medicated and unable to communicate beyond making moans and groans.

On December 7, Trooper Wukich obtained a search warrant for Kincaid's medical records, which included his blood toxicity results from December 2. In the affidavit for search warrant, he swore to the following:

> At 2040 on 12/02/20[,] I (Trp. J. Wukich) was dispatched to a single vehicle crash. The location of the crash was East Bound I64 at 127 mm. I arrived on scene at 2109. When I arrived on scene[,] I observed a white vehicle mangled up in the median with the roof off the vehicle. The front of the vehicle was in the cabin of the car. The engine was twisted and standing straight up. There w[ere] skid marks in the left lane and tire tracks in the grass in the median. Then on the embankment there [were] tracks. The tracks lead to a tree that the vehicle hit. The driver ROBERT DEAN KINCAID JR and passenger CASEY HANEY were already transported to UVA hospital with life threat[en]ing injuries.
>
> When I walked toward the vehicle[,] I immediately smelled alcohol coming from the car. In the car there w[ere] 2 airplane bottles of fireball, one was in the passenger seat [and] the other bottle in the center cup holder. There was a mike['s] harder lemonade in the passenger floor board. And a twisted tea in the passenger floor board.
>
> I then went to UVA hospital to interview the driver and passenger. HANEY was intubated and KI[N]CAID JR was alert but in a lot of pain. KINCAID did admit to driving but then became in pain. At which point I decided to end the interview until he can heal. KINCAID did have glassy and blood shot eyes when I was speaking to him. I interviewed KINCAID on 12-6-20 and asked if he had anything to drink that day and KINCAID stated "no."

Kincaid's medical records revealed that at 9:15 p.m. on December 2, 2020, his blood alcohol concentration was either .15 or .188 per deciliter depending on the type of blood alcohol test performed. Kincaid was released from the hospital on December 30, 2020.

Out of the assertions made by counsel during pretrial hearings, the ones relevant to our analysis are that Kincaid had prior interactions with law enforcement and the court system. He had a criminal history that included a prior felony, two recent misdemeanor offenses for assault and battery, and one misdemeanor charge for violating a protective order. Also relevant was the notation in Kincaid's medical records that he had been administered sedatives and had been in a medically induced coma during his time in the hospital.

The trial court denied the motion to suppress Kincaid's statements. The court found that there was not "any type of police restraint that would have required *Miranda*." The court further found that Kincaid's statements were voluntary. The trial court made detailed findings, including that the interactions between Kincaid and the trooper each lasted for a "relatively short period of time," that only a very few questions were asked, and that Kincaid had "some experience with the procedures" involved in a driving under the influence investigation. The trial court also found that there was no police coercion nor intimidating behavior present in the questioning. The trial court found that Kincaid was never handcuffed and was not placed under arrest, that other officers were not placed outside of his room, and that law enforcement did not place any limitations on who could access Kincaid's room. The court further found that, based on its observations, Trooper Wukich's physical appearance was not intimidating based on his size compared to Kincaid's.

As to the search warrant for Kincaid's medical records and *Franks* challenge, defense counsel maintained that Trooper Wukich materially and deliberately misrepresented Kincaid's admission on December 2, 2020, that he was driving the vehicle that night. Kincaid further asserted that the trooper intentionally omitted material information about Kincaid's medical condition during the two interviews with him. Kincaid pointed to Trooper Wukich's testimony on cross-examination at the preliminary hearing:

Q: So was it a groaning sound or was it uh-huh?

A: It's . . . the same. Just a "uh-huh" sound. I asked him . . . were you driving, he said "uh-huh." Like I said, he was in a lot of pain, so, you know, [I wasn't] getting a lot from him at that point, I knew I wasn't going to get anything from him. So, all I could do was just get my visual observation.

Q: So, [it] would [be] fair to say your confidence level about his ability to understand what you were saying is not very high, correct?

A: Correct, yeah because I—by the scene of the crash and failure of the seatbelt and everything, it—he could have hit his head real hard at that point, so I did not think that he was in any situation at that point for me to try to interview him. At that point, he . . . needed to be seen by a doctor.

The trial court denied Kincaid's motion to suppress his medical records and his request for a *Franks* hearing. The court found credible the trooper's testimony about Kincaid's state and noted that, while some could disagree about the reliability of Kincaid's admission on December 2, Kincaid had not met the *Franks* standard because the trooper's affidavit statements were not made with reckless disregard for the truth. The court also ruled that, even with Kincaid's admission excised from the affidavit, probable cause remained for the search warrant.

ANALYSIS

I. Motion to Suppress Statements

On appeal, when alleging that the trial court committed reversible error by denying a motion to suppress, the appellant bears the burden of proof. *Keepers v. Commonwealth*, 72 Va. App. 17, 33 (2020) (citing *Secret v. Commonwealth*, 296 Va. 204, 224 (2018)). A review of whether an interaction with law enforcement requires *Miranda* warnings presents a mixed question of law and fact, which we review de novo, granting deference to the trial court's findings of fact, unless they are plainly wrong. *Spinner v. Commonwealth*, 297 Va. 384, 392 (2019) (citing *Hicks v. Commonwealth*, 281 Va. 353, 359 (2011)). "When considering whether to affirm the denial of a

- 10 -

pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Tirado v. Commonwealth*, 296 Va. 15, 24 (2018) (quoting *Commonwealth v. White*, 293 Va. 411, 414 (2017)).

Over 50 years ago, the United States Supreme Court held that custodial interrogations of a defendant were required to be preceded by the giving of the now commonly known *Miranda* warnings by law enforcement. *Miranda*, 384 U.S. at 445-58, 479. "However, this requirement does not extend to non-custodial interrogations; the suspect must be 'both in custody and subjected to interrogation' before police must provide *Miranda* warnings." *Alvarez Saucedo v. Commonwealth*, 71 Va. App. 31, 41 (2019) (quoting *Watts v. Commonwealth*, 38 Va. App. 206, 214 (2002)).

The issue before this Court is whether Kincaid was in custody when he was questioned by Trooper Wukich on December 2 and on December 6, 2020. We conclude that he was not. In determining whether a defendant is in custody, an appellate court must determine "how a reasonable person in the suspect's situation would have understood his circumstances." *Alvarez Saucedo*, 71 Va. App. at 41 (quoting *Dixon v. Commonwealth*, 270 Va. 34, 40 (2005)). In this case, the trial court made numerous findings of fact relevant to our inquiry.

Kincaid was neither handcuffed nor restrained in any way. Neither his, nor anyone else's, movements into or out of his exam or hospital room were restricted by law enforcement. While the trooper was in uniform, with his badge and weapon displayed, but not drawn, he was the only law enforcement officer at the scene of either questioning of Kincaid. Both encounters were very brief and consisted of very few questions. Kincaid was not taken into custody at the conclusion of either interview. Considering these facts, we cannot say that the trial court was wrong in finding that the encounters did not amount to the custodial nature that would trigger the requirement of *Miranda* warnings.

The findings of fact made by the trial court also establish that the statements made by Kincaid that he was driving were voluntary statements. Determining if "a statement was voluntary or the result of coercive police activity is a legal question to be determined from a review of a totality of the circumstances." *Gwaltney v. Commonwealth*, 19 Va. App. 468, 472 (1995). We look to relevant factors that include "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview." *Washington v. Commonwealth*, 43 Va. App. 291, 302 (2004).

While Kincaid argues that his medical condition renders his statement involuntary, he does not argue that law enforcement used coercive tactics or engaged in flagrant police misconduct during either interview. Instead, as found by the trial court, the trooper engaged in two very brief interviews, each consisting of very few questions. The court found credible the testimony of the trooper describing Kincaid's responses to his questions in both interviews. He was able to demonstrate gestures made by Kincaid and observed that Kincaid was very coherent. The trooper ended the first interview when he saw that the defendant was exhibiting pain. Also found by the trial court to be relevant was Kincaid's experience with the criminal justice system.

Considering these facts, we, likewise, cannot say the trial court was wrong in finding that the statements made by Kincaid were voluntary statements.

## II. Motion to Suppress Medical Records

Kincaid makes two related arguments to support his assertion that the toxicity results contained in his medical records should have been suppressed. First, he argues that Trooper Wukich's affidavit presented to the magistrate considering whether probable cause existed to issue the search warrant contained deliberate misrepresentations and reckless omissions. Kincaid asserts that without the inclusion of those facts that the affidavit was insufficient to establish the probable cause required for the issuance of the search warrant. Second, Kincaid argues that the trial court

erred in denying him an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, in order to establish the falsity of statements made in the affidavit.

A defendant is entitled by the Fourth Amendment to a hearing that challenges what appears to be a valid search warrant only in limited circumstances. *Franks*, 438 U.S. at 171-72. The defendant has the burden to make a "substantial preliminary showing" of a false statement that was "knowingly and intentionally included in the warrant affidavit or included with reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Davis v. Commonwealth*, 65 Va. App. 485, 497 (2015) (citing *Franks*, 438 U.S. at 171). If the trial court finds that the defendant has made the substantial preliminary showing, then the trial court must "determine whether the allegedly false statement is necessary to the finding of probable cause." *Id.* at 487 (citing *Franks*, 438 U.S. at 172). "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing [pursuant to *Franks*] is required." *Barnes v. Commonwealth,* 279 Va. 22, 31 (2010) (quoting *Franks*, 438 U.S. at 171-72).

Here, the only statement that Kincaid alleges to be false is that he admitted to the trooper to being the driver of the vehicle. The trial court, however, found that even without the inclusion of Kincaid's admission to being the driver in the affidavit, that the affidavit contained a sufficient showing of probable cause for the issuance of the search warrant. "[T]he existence of probable cause is determined by examining the totality-of-the-circumstances." *Anzualda v. Commonwealth,* 44 Va. App. 764, 774 (2005) (en banc) (quoting *Janis v. Commonwealth*, 22 Va. App. 646, 651 (1996)). "[T]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that . . . evidence of a crime will be found in a particular place." *Id.* at 774-75.

The affidavit in this case contained a detailed description of the single car crash. It identified the driver as Kincaid and the passenger as Haney, as related to the trooper by emergency personnel on the scene. It described an odor of alcohol coming from the passenger compartment of the vehicle and the observation of containers of alcohol within the vehicle. Finally, the affidavit contained a description of Kincaid not long following the crash as having glassy and bloodshot eyes. Sufficient content in the affidavit remains to support the finding of probable cause even after removing the allegedly false part of the statement. Kincaid's admission that he was the driver of the vehicle was not necessary to the finding of probable cause for the issuance of the search warrant, and therefore no *Franks* hearing was required.

### III. Impeachment Evidence

An appellate court reviews a trial court's decision regarding the admissibility of evidence for abuse of discretion. *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021). Although the trial court has discretion, it is not "free to simply act in any way it may deem desirable under the circumstances." *Id.* Rather, "the circuit court 'has a range of choice, and . . . its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* at 93 (quoting *Landrum v. Chippenham and Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)).

Kincaid argues that the trial court erred in permitting the Commonwealth to cross-examine his mother about an assault and battery charge that was pending against him and later dismissed when she recanted her original complaint. In addition, he argues that it was error for the trial court to permit the Commonwealth to play a recording of 911 calls made following the alleged assault and battery. Kincaid asserts that allowing the evidence impermissibly allowed the jury to hear evidence of prior bad acts allegedly committed by him.

- 14 -

"[E]vidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). "As an exception to the general rule of exclusion, however, evidence of other crimes or bad acts is admissible 'if relevant to a material issue or element of consequence in the case." *Shifflett v. Commonwealth*, 29 Va. App. 521, 530 (1999) (quoting *Foster v. Commonwealth*, 5 Va. App. 316, 319 (1987)). The court must determine if the "legitimate probative value of such proof outweighs its incidental prejudice." Va. R. Evid. 2:404(b).

Rule 2:610 of the Virginia Rules of Evidence simply states the long-standing law of the Commonwealth regarding impeachment of a witness on the basis that he or she is biased. *Henson v. Commonwealth*, 165 Va. 821, 825-26 (1936), states that:

> The bias of a witness, like prejudice and relationship, is not a collateral matter. The bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness. . . . [O]n cross-examination great latitude is allowed and . . . the general rule is that anything tending to show the bias on the part of a witness may be drawn out.

In this case, Theresa testified contrary to other witnesses. Her testimony concerning statements made by Kincaid and his ability to convey them following the crash was different than the trooper's. She also testified that Haney was driving at the time of the crash, contrary to all of the evidence presented in the Commonwealth's case. While any witness who testifies at trial places his or her credibility at issue, Theresa's testimony was especially important for the jury's consideration of the case. When considering the bias evidence proposed to be introduced, the trial court thoroughly reviewed the facts and the evidence, conducted a balancing analysis, and reached a thoughtful conclusion that limited the details of the assault and battery allegation that could be heard by the jury but permitted the jury to consider Theresa's recantation on the issue of bias.

The trial court also permitted the jury to hear some portion of the calls made to 911. However, given that neither the recordings nor a transcript of the recordings was made a part of this record, we have no basis to evaluate the prudence of the admission of that evidence. Clearly, however, the trial court was well aware of the law and had applied it correctly in determining the scope of the cross-examination of Theresa. We assume that the trial judge did so on this issue, as well. "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977).

## IV. Motion to Strike

Kincaid argues that the trial court erred in denying his motion to strike the evidence. However, he bases his argument solely on his assertions that the trial court erred in the rulings on his motion to suppress his statements, his motion to suppress the medical records, and his allegations of error in the cross-examination of his mother. Having found that the trial court did not err in those rulings, we find that the trial court did not err in denying Kincaid's motion to strike.

## CONCLUSION

The trial court properly ruled that Kincaid was not in custody when questioned by the trooper and that Kincaid's statements made were voluntary. The trial court also properly ruled that probable cause existed in the affidavit for the issuance of the search warrant for Kincaid's medical records and properly denied his request for a *Franks* hearing. We find the trial court did not abuse its discretion in allowing the cross-examination of Theresa or the playing of the 911 calls. Finally, based on all of those findings, the trial court did not err in denying Kincaid's motion to strike. Thus, we affirm appellant's conviction.

*Affirmed.*