COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, McClanahan, Haley, Petty,
         Beales, Powell and Alston
Argued at Richmond, Virginia

GLEN PATRICK MERRITT

                                                          OPINION BY
v.       Record No. 1871-08-1                      JUDGE ELIZABETH A. McCLANAHAN
                                                          JANUARY 25, 2011
COMMONWEALTH OF VIRGINIA


                          UPON A REHEARING EN BANC

            FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                           William R. O'Brien, Judge

            Harry Dennis Harmon, Jr., for appellant.

            Josephine F. Whalen, Assistant Attorney General II (Kenneth T.
            Cuccinelli, II, Attorney General, on brief), for appellee.


        A jury convicted Glen Patrick Merritt of possession of ecstasy (MDMA), a Schedule I

controlled substance, with intent to distribute, second or subsequent offense, in violation of Code

§ 18.2-248; transporting ecstasy into the Commonwealth, with intent to distribute, in violation of

Code § 18.2-248.01; and conspiracy to possess ecstasy with intent to distribute in violation of

Code § 18.2-256. The Commonwealth's theory was that Merritt served as the "muscle" in an

illegal narcotics scheme in which his role was to safeguard the transportation of a large quantity

of ecstasy into the Commonwealth. Merritt contends the evidence failed to prove the

Commonwealth's theory and was, therefore, insufficient to support his convictions. A panel

majority of this Court agreed and reversed the convictions.[1] We granted a petition for rehearing

_____

        [1] Merritt also contended the trial court erred in denying his motion to suppress evidence.
However, counsel for Merritt conceded at oral argument before the panel that the suppression
issue was not preserved and not properly before this Court. See Rule 5A:18; Lenz v.

*en banc* and stayed the mandate of the panel decision. Upon rehearing *en banc*, we affirm the trial court.

## I. STANDARD OF REVIEW

"On review of a challenge to its sufficiency, we view the evidence in the light most favorable to the Commonwealth, the party prevailing below, and grant to it all reasonable inferences fairly deducible therefrom." Nolen v. Commonwealth, 53 Va. App. 593, 595, 673 S.E.2d 920, 921 (2009); see also Barnes v. Commonwealth, 279 Va. 22, 35, 688 S.E.2d 210, 217 (2010). "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt." United States v. Powell, 469 U.S. 57, 67 (1984). See also McMillan v. Commonwealth, 277 Va. 11, 19, 671 S.E.2d 396, 399 (2009); Jones v. Commonwealth, 277 Va. 171, 182, 670 S.E.2d 727, 734 (2009); Clanton v. Commonwealth, 53 Va. App. 561, 566, 673 S.E.2d 904, 906-07 (2009) (*en banc*).

## II. BACKGROUND

On August 6, Virginia Beach police conducted an undercover drug interdiction at a bus depot operated by Today's Bus, a bus line that conducts nonstop bus trips between the cities of Virginia Beach and New York.[2] Detective Dean Massetti arrived at the depot, dressed in civilian clothes, with his K-9, Sheena, at approximately 12:30 a.m. as the bus from Chinatown in New York was pulling into the depot parking lot. Detective Christopher Biswurm arrived shortly

---

Commonwealth, 261 Va. 451, 463, 544 S.E.2d 299, 306 (2001) (failure to request ruling on pretrial motion waives issue on appeal).

[2] A drug interdiction is the process whereby police stop the illegal flow of narcotics into the Commonwealth from outside sources. This bus depot had been identified by Virginia Beach police as a major pipeline of large quantities of narcotics entering into Virginia Beach from New York. The company runs the bus depot as a "cash-and-go service," and since there is no identification or baggage check, an individual can "go unchecked to and from New York City." The Virginia Beach police routinely conduct drug interdictions at this depot.

thereafter and followed Massetti and Sheena through the parking lot as they approached the bus. Sergeants Kenneth Dimitry and Richard Brereton were stationed nearby and observed a silver Lexus enter the parking lot. Because the driver and passenger of the Lexus "literally snapped their heads around to look at what was going on" when Massetti and Sheena passed by them, Dimitry and Brereton continued to watch them and observed the Lexus move out of the lighted area of the parking lot into a darker area that provided easy access to the road. The driver and passenger were later identified as Perry Bolton and Glen Merritt respectively. Merritt exited the vehicle holding a cell phone to his ear and followed Massetti and Sheena toward the bus. Merritt stood at the rear of the bus as Massetti sent Sheena into the luggage compartment of the bus to detect the odor of any illegal narcotics.[3] Although Merritt was holding a cell phone to his ear, he was not talking into the cell phone or changing facial expressions but focused his attention on the luggage compartment area. In fact, according to Detective Biswurm, it would have been too noisy at the rear of the bus to hear anyone on a cell phone. He compared Merritt's behavior to that of police officers conducting surveillance who "act like we're talking into our phone, basically to draw attention away from us."

After a short period of time, Merritt began looking into the crowd of passengers departing from the bus. Merritt then turned his attention to a male, later identified as Anthony McDaniels, as McDaniels looked in the luggage compartment. McDaniels retrieved a suitcase from the luggage compartment and, accompanied by Erica Spratley, walked in front of Merritt. There was no greeting between Merritt and McDaniels or Spratley, but Merritt began "shadowing" McDaniels and Spratley and "behaving as if he was being a lookout" as they walked across the

---

[3] Sheena did not "alert" on any illegal narcotics in the luggage compartment.

parking lot.[4] Sergeant Dimitry testified that Merritt was, again, behaving the same way police do when they run surveillance on undercover drug operations.[5] When McDaniels and Spratley reached the vehicle, Merritt continued walking past the vehicle and stood fifteen to thirty feet away "scanning the parking lot" and "watching what was taking place at the vehicle." Bolton exited the vehicle, retrieved the suitcase from McDaniels, and placed it into the trunk of the Lexus.

Sergeant Dimitry instructed Massetti and Biswurm to approach the occupants of the Lexus because he believed they were acting "out of the ordinary for someone just picking somebody up from the bus stop." As they approached, Massetti observed a plastic baggie corner on the ground underneath the front passenger's door. According to Massetti and Biswurm, a plastic baggie corner is a common delivery system for street-level narcotics. This plastic baggie corner appeared to be "discarded remains." Massetti took Sheena back to his van, retrieved a flashlight, and returned to the Lexus. When he returned, McDaniels was seated in the driver's seat.[6] Merritt was seated in the front passenger's seat. Bolton was seated in the rear seat behind McDaniels, and Spratley was seated in the rear seat behind Merritt. Massetti identified himself to McDaniels and asked him about the baggie corner. McDaniels claimed to have no knowledge of it. As Massetti was talking with McDaniels, Merritt began leaning forward and toward the console as well as manipulating his left front pocket, which appeared to have "something very bulky" in it. Concerned for his safety, Massetti asked if there were any weapons or drugs in the

---

[4] According to Detective Biswurm, Merritt followed behind McDaniels and Spratley staying fifteen to twenty feet behind them.

[5] Dimitry explained they typically place officers on foot to act like they are talking on their cell phones to act disinterested in what is going on around them. Those officers will shadow the undercover officer buying drugs to provide cover and ensure the safety of the operation is not compromised.

[6] It was established at trial that McDaniels was the owner of the Lexus.

- 4 -

car. Bolton said he had a gun in the center console and ammunition in the glove compartment. Massetti and Biswurm, now joined by Dimitry and Brereton, then instructed all the occupants to exit the vehicle so they could be frisked for weapons. Although no guns were found on the occupants, Merritt was carrying a small knife attached to his belt. Two cell phones were found in Merritt's left front pocket. When Massetti retrieved the gun from the console, he observed a small Zip-loc baggie sticking out of a small compartment to the left of the steering wheel and containing blue powder residue and a clear capsule. The residue field-tested positive for ecstasy (MDMA). Massetti recovered a .45 caliber semi-automatic handgun in the center console. In the glove compartment, he found the rounds belonging to the handgun "inside the magazine, so the magazine was ready to go."[7]

After the discovery of the baggie containing ecstasy, Massetti and Biswurm conducted a search of the vehicle. In the trunk, they found a black suitcase containing several items of clothing, a shoebox containing a wallet and a pair of shoes, and a heat-sealed bag containing 998 tablets of ecstasy (MDMA). In the rear passenger's seat of the vehicle, where Bolton had been sitting, was a Western Union receipt for $125 that was wired from Bolton to Merritt in New York City on August 2. Massetti testified that Western Union is commonly used in the drug industry to transfer money as payment for drugs or services. Also found in the same area was a receipt from the Smoke Shack dated August 5 for the purchase of 842 plastic baggies. According to Massetti, plastic baggies are commonly used for distribution of narcotics, such as ecstasy. Additionally, four tickets, purchased on July 27, for one-way trips between New York and Norfolk[8] were found. The detectives also recovered a blue spiral notebook containing "drug

---

[7] The jury was shown the gun and magazine during Detective Massetti's testimony.

[8] Although the bus depot is actually located in Virginia Beach, the discrepancy between the location identified on the tickets and the actual location of the bus depot was not addressed by the parties and is not relevant to the issues on appeal.

notes" consisting of quantities of narcotics, monetary value, and initials or other information identifying an individual associated with the narcotics. On the last page of the notebook the letters "GMNY" were recorded with the figure of "1,000" next to the letters.

After arresting the four occupants, $1,336 in cash was recovered from Bolton and $1,410 in cash was recovered from McDaniels. The cash was subsequently screened with Sheena, and she alerted to the scent of illegal narcotics on the money. When Massetti and Biswurm examined the call records in the cell phones collected from Merritt, Bolton, and McDaniels, they discovered that Bolton's cell phone contained the name "G Money" for the cell phone number of one of the phones found on Merritt. Massetti and Biswurm also determined there had been a large number of phone calls received and dialed between these cell phones in the several preceding days.

Upon questioning, Merritt told Massetti he did not know the other occupants of the Lexus well. Merritt said he was walking to his girlfriend's house when Bolton stopped and offered him a ride. Bolton told Merritt he had to go to the bus depot first and instructed Merritt to get out of the car and walk to the bus when they arrived there. Merritt claimed he did not know why Bolton wanted him to get out of the car or stand at the bus. When Massetti told Merritt the police saw him carry the suitcase across the parking lot,[9] Merritt "quickly" replied, "Tony was the one who wheeled the bag across the parking lot." When Massetti asked who "Tony" was, Merritt told him he was referring to McDaniels. After Massetti remarked he thought Merritt did not know him well, Merritt said he knew McDaniels from middle school.

Massetti, who was trained at the local, state, and federal levels on narcotics distribution, and has worked hundreds of cases involving narcotics distribution as the lead detective, was

---

[9] Massetti testified that he knew McDaniels had the suitcase but he made this remark "for checks and balances" purposes in his questioning.

qualified at trial as an expert in illegal narcotics distribution. Massetti described the roles of individuals in drug distribution schemes and explained the primary dealer "has the money" and "does the distribution portion." There is generally a "secondary person that is the muscle of the outfit." Massetti described the secondary person as "usually somebody that is either bigger physically in stature" or armed who protects the money or drugs. The "mules" are the individuals who are paid either by money or a portion of the drugs to retrieve the illegal narcotics and take the risk of bringing the drugs into the Commonwealth. In Massetti's opinion, Merritt was "an active part [of this drug scheme] as a muscle in the organization." Massetti explained the Western Union receipt proved Merritt was in New York and received money from Bolton just days before the drugs were transported into the Commonwealth. There were numerous phone calls between Bolton, Merritt, and McDaniels in the days preceding the transaction. Merritt was observed shadowing McDaniels and Spratley after they departed from the bus and wheeled the suitcase containing drugs across the parking lot. Massetti testified that the use of two cell phones is commonly used in the drug industry with one phone for personal use and the other phone for business use. Massetti further stated Merritt's close proximity to the gun and magazine was consistent with his role as the "muscle." Massetti considered the designation of "GMNY" in the drug notebook significant because "G Money" was the identifier found in Bolton's cell phone for the cell phone number of one of the cell phones found in Merritt's pocket. Massetti testified the fact that Merritt did not have drugs or money on his person was also consistent with his role as the "muscle" since he is the "safety guy," whose role it is to make sure the drug transaction takes place without someone stealing the drugs or money.

Detective Thomas Fowler, qualified as an expert in the use, packaging, and distribution of narcotics, testified that possession of 998 ecstasy pills was inconsistent with personal use and was packaged for transportation and distribution. The value of each ecstasy tablet in Virginia

Beach and Hampton Roads is $15 to $30, and the sale of 998 tablets of ecstasy would generate a profit of $10,000 to $30,000. Detective Fowler also discussed the roles of individuals involved in a drug organization and described the "muscle" of the organization as the "enforcer" or "lookout." The functions of the "muscle" are to protect the illegal narcotics and "chase down" payments that are due. He is often willing to carry a firearm or other weapon and not afraid to use it. Detective Fowler stated the $125 sent from Bolton to Merritt in New York could have been payment for an additional night's lodging or Merritt's return home. In Detective Fowler's opinion, the occupants of the Lexus were involved in a prearranged drug transaction based on the quantity of drugs, the presence of a firearm, the multiple cell phones, the large amount of cash emanating the scent of illegal narcotics, and the Western Union receipt showing the transfer of money from Bolton to Merritt days before the transportation of the drugs into the Commonwealth.

## III. ANALYSIS

Merritt argues the evidence was insufficient to sustain his convictions because the Commonwealth's theory he acted as a "muscle" or "lookout" in this illegal narcotics scheme was merely speculative and without sufficient evidentiary basis. Thus, reasons Merritt, the Commonwealth could not prove "Merritt possessed or had knowledge of the illegal drugs" or that he "participated as an accessory in any illegal drug activity." We disagree.

### A. Evidence to Support Merritt's Role as "Muscle" or "Lookout"

Merritt and Bolton arrived at a bus depot known as a major pipeline of narcotics into Virginia Beach in a vehicle that was ultimately parked in a dark area of the lot facing the road providing easy access to the highway. Merritt was observed "shadowing" the movements of McDaniels and Spratley, holding a cell phone to his ear without speaking into it or showing any emotion, and continually "scanning" the parking lot. While Bolton placed the drugs into the

trunk of the vehicle, Merritt posted himself behind the vehicle as he continued to scan the parking lot. Merritt's actions were described as being consistent with the actions undertaken by police officers conducting surveillance of undercover detectives in that Merritt attempted to be covert, work with his environment, and act disinterested without drawing attention to himself. In fact, Merritt's actions to protect the safety of the drug transaction were compared to the actions of a surveillance officer in protecting the safety of an undercover officer.

At no time did Merritt acknowledge McDaniels or Spratley while following them in the parking lot thus supporting the reasonable inference that he was not there to meet them and lead them to the vehicle.[10] The only logical inference from this evidence is that Merritt was acting as a lookout while McDaniels and Spratley transported the drugs through the parking lot. Although Merritt claimed not to know Bolton, McDaniels or Spratley well, he told Detective Massetti that "Tony" was the one who "wheeled the bag across the parking lot" indicating a sufficient familiarity with McDaniels to use a nickname. Furthermore, calls to McDaniels were found in Merritt's cell phone. In fact, police discovered a large number of phone calls made between the cell phones found on Merritt, Bolton, and McDaniels in the several days immediately preceding the arrest.

In addition to Merritt's actions at the bus station supporting his role as the "lookout" for this transaction and the phone calls linking him to the other individuals involved in the drug transaction, police recovered evidence at the scene showing Merritt's direct involvement in the transportation, possession, and distribution of illegal drugs. A plastic baggie corner containing drug residue was found on the ground next to the front passenger's door of the vehicle where Merritt was sitting, and its location and condition were consistent with having recently fallen out

---

[10] Merritt's explanation to Massetti that he was instructed by Bolton to get out of the car and walk to the bus upon their arrival, without giving him any reason for doing so, was understandably rejected by the jury as not credible.

of the front passenger's side of the vehicle.  Within the vehicle, police recovered a drug notebook containing notes regarding the subject drug transaction specifically identifying the transaction as "GMNY 1000," which the jury could reasonably infer referred to Glen Merritt, New York, or G Money, New York, and the quantity of ecstasy pills, of which 998 were recovered by police. With this notebook were four bus tickets for transportation between Norfolk and New York and receipts dated August 5 for a large number of baggies.  In addition, the police recovered a Western Union receipt showing a payment of $ 125 from Bolton to Merritt that he received in New York on August 2.  According to expert testimony, Western Union is commonly used in the drug industry for payments for services and the $125 was likely sent to Merritt for an additional night's stay in New York and/or his transportation back to Virginia.  Two cell phones were recovered from Merritt further supporting his involvement in the transaction since the use of two cell phones is common in the narcotics trade.  And one of Merritt's cell phone numbers was identified as "G Money" in Bolton's cell phone.  The police found a handgun in the console next to where Merritt was sitting and the magazine "ready to go" in the glove compartment directly in front of where Merritt was sitting.  Therefore, the jury could reasonably infer Merritt had access to a firearm and, as the Commonwealth argued, could have been carrying the gun in the parking lot before he returned to the vehicle.  Furthermore, the jury was undoubtedly in the best position to observe Merritt and judge whether his stature was consistent with the role of a "muscle" or "lookout" in this transaction.

Moreover, the jury was presented with expert testimony from Detective Massetti, who gave an opinion, unchallenged on appeal, that based on his training, experience, and observations, Merritt was the "muscle" or "lookout" in this drug transaction.  "'The jury has a right to weigh the testimony of all the witnesses, experts and otherwise.'"  Hill v. Commonwealth, 8 Va. App. 60, 64, 379 S.E.2d 134, 137 (1989) (*en banc*) (quoting Martin v.

<u>Penn</u>, 204 Va. 822, 826, 134 S.E.2d 305, 307 (1964)).  The conclusions of the fact finder on issues of witness credibility "may only be disturbed on appeal if this Court finds that [the witness'] . . . testimony was 'inherently incredible, or so contrary to human experience as to render it unworthy of belief.'"  <u>Robertson v. Commonwealth</u>, 12 Va. App. 854, 858, 406 S.E.2d 417, 419 (1991) (quoting <u>Fisher v. Commonwealth</u>, 228 Va. 296, 299-300, 321 S.E.2d 202, 204 (1984)).  "These same principles apply to the testimony of both expert and lay witnesses." <u>Moyer v. Commonwealth</u>, 33 Va. App. 8, 28, 531 S.E.2d 580, 590 (2000) (*en banc*).  It is clear the jury accepted the testimony of Detective Massetti, and we cannot say his testimony was inherently incredible or unworthy of belief.

In sum, from this evidence, the jury could reasonably infer Merritt was in New York days before the arrest to arrange the purchase of 1,000 ecstasy pills when he received money from Bolton and served as the "muscle" or "lookout" as the drugs were transported for the purpose of further distribution.  We may not "'substitute our judgment for that of the trier of fact,'" <u>Wactor v. Commonwealth</u>, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002) (quoting <u>Commonwealth v. Presley</u>, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)), nor may we "reweigh the evidence," <u>Nusbaum v. Berlin</u>, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because we have no authority "to preside *de novo* over a second trial," <u>Haskins v. Commonwealth</u>, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004).

## B.  <u>Sufficiency of Evidence to Support Convictions</u>

Since it was reasonable for the jury to infer from this evidence that Merritt served as the "muscle" or "lookout" in this drug transaction, the jury could rationally find Merritt guilty of aiding and abetting in the possession of ecstasy with intent to distribute, aiding and abetting in the transportation into the Commonwealth of ecstasy with intent to distribute, and conspiracy to distribute ecstasy.

1. Possession With Intent To Distribute[11]

"To convict a defendant of illegal possession of drugs, the Commonwealth must prove that the defendant was aware of the presence and character of the drugs, and that he intentionally and consciously possessed them." Andrews v. Commonwealth, 216 Va. 179, 182, 217 S.E.2d 812, 814 (1975).

> "[P]roof of actual possession is not required; proof of constructive possession will suffice. Constructive possession may be established when there are acts, statements, or conduct of the accused or other facts or circumstances which tend to show that the [accused] was aware of both the presence and character of the substance and that it was subject to his dominion and control."

Wilson v. Commonwealth, 272 Va. 19, 27, 630 S.E.2d 326, 330 (2006) (quoting Walton v. Commonwealth, 255 Va. 422, 426, 497 S.E.2d 869, 872 (1998)) (internal quotation marks and citation omitted). "Possession . . . need not be exclusive, but may instead be joint." Archer v. Commonwealth, 225 Va. 416, 418, 303 S.E.2d 863, 863 (1983).

The jury was instructed that it could find Merritt guilty as a principal in the second degree. To hold Merritt accountable as a principal in the second degree, the Commonwealth was required to show that Merritt was present, aiding and abetting in the possession of the ecstasy. McGill v. Commonwealth, 24 Va. App. 728, 733, 485 S.E.2d 173, 175 (1997).

> A principal in the second degree is one not the perpetrator, but present, aiding and abetting the act done, or keeping watch or guard at some convenient distance. * * * Every person who is present at the commission of a [crime], encouraging or inciting the same by words, gestures, looks, or signs, or who in any way, or by any means, countenances or approves the same is, in law, assumed to be an aider and abettor, and is liable as principal.

---

[11] Due to the uncontested evidence that the quantity of ecstasy was inconsistent with personal use, Merritt does not argue that the Commonwealth failed to prove the drugs were possessed with the intent to distribute, rather that they were not possessed by him.

Foster v. Commonwealth, 179 Va. 96, 99, 18 S.E.2d 314, 315-16 (1942) (internal quotation marks and citation omitted); see also Dunn v. Commonwealth, 52 Va. App. 611, 665 S.E.2d 868 (2008) (*en banc*); Pugliese v. Commonwealth, 16 Va. App. 82, 428 S.E.2d 16 (1993).

Having found Merritt to be the "muscle" or "lookout" in this drug transportation scheme, it was reasonable for the jury to conclude Merritt was aware of the presence and character of the ecstasy and that he aided and abetted his companions in their possession and intent to distribute the ecstasy. His role, as found by the jury, was to be present at the bus depot when McDaniels and Spratley brought the ecstasy off the bus, follow them as they carried the ecstasy to the vehicle, and keep a lookout as the ecstasy was placed in the trunk of the vehicle. As such, the evidence was sufficient to prove Merritt was "present lending countenance, or otherwise aiding" the possession of the drugs with intent to distribute. Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 32 (2005).

### 2. Transportation into Virginia

To prove Merritt was guilty of transporting ecstasy with the intent to distribute, the Commonwealth was required to prove he transported more than one ounce of ecstasy "into the Commonwealth by any means with intent to sell or distribute [it]." Code § 18.2-248.01. Merritt does not contend that the Commonwealth failed to prove more than one ounce of ecstasy was transported into the Commonwealth with the intent to distribute it, but that the Commonwealth failed to prove his role as "muscle" or "lookout" in this transaction and thus, his participation as an accessory. To hold Merritt accountable as a principal in the second degree, the Commonwealth was required to show that Merritt was present, aiding and abetting in the transportation of the ecstasy with the intent to distribute it. McGill, 24 Va. App. at 733, 485 S.E.2d at 175. The drug notebook found by police contained an entry associating Merritt to this transaction by designating the transaction as "GMNY 1000." Based on the Western Union

receipt for cash wired from Bolton to Merritt in New York on August 2, the jury could infer Merritt was there to arrange the purchase of the ecstasy for transportation into Virginia. And Merritt acted to ensure the successful transportation of the ecstasy into Virginia by serving as a "lookout" when McDaniels retrieved the drugs from the bus and carried them to the vehicle. Accordingly, we conclude the evidence was sufficient to prove Merritt was "present lending countenance, or otherwise aiding" his companions in the transportation of the drugs into the Commonwealth with intent to distribute them. Muhammad, 269 Va. at 482, 619 S.E.2d at 32.

### 3. Conspiracy to Distribute

To prove a conspiracy, the Commonwealth was required to show "'an agreement between two or more persons by some concerted action to commit [possession of ecstasy with intent to distribute].'" Wright v. Commonwealth, 224 Va. 502, 506, 297 S.E.2d 711, 713 (1982) (quoting Falden v. Commonwealth, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)); Williams v. Commonwealth, 53 Va. App. 50, 59-60, 669 S.E.2d 354, 358 (2008). "Because most conspiracies are 'clandestine in nature,' 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(a), at 266 (2d ed. 2003), by 'the very nature of the offense, it often may be established only by indirect and circumstantial evidence,' Wright, 224 Va. at 505, 297 S.E.2d at 713." James v. Commonwealth, 53 Va. App. 671, 678, 674 S.E.2d 571, 575 (2009) (internal quotation marks omitted).

The jury found Merritt was the "muscle" or "lookout" in this illegal drug transaction involving the transportation of 998 tablets of ecstasy into the Commonwealth. In so finding, the jury concluded Merritt arrived at the depot to meet the bus arriving from New York for the purpose of providing security as the drugs were removed from the bus and carried to the vehicle. The evidence included phone calls between Merritt, Bolton, and McDaniels in the days preceding the transaction, a Western Union receipt showing Bolton wired Merritt money while

Merritt was in New York City just days before the transaction, the written notation, "GMNY 1000," in the drug notebook found with Bolton, a receipt for plastic baggies purchased days before the transaction, and four one-way tickets to and from New York purchased before the transaction. Based on this evidence, it was reasonable for the jury to conclude, as testified to by Detective Fowler, that this was a prearranged transaction and to infer that Merritt agreed with his companions to serve as the "muscle" or "lookout" in their plan to transport ecstasy into the Commonwealth and possess it with the intent to distribute it. When

> it has been shown that the defendants "by their acts *pursued the same object*, one performing *one part* and the others performing *another part* so as to complete it or with a view to its attainment, the [fact finder] will be justified in concluding that they were engaged in a conspiracy to effect that object."

Charity v. Commonwealth, 49 Va. App. 581, 586, 643 S.E.2d 503, 505 (2007) (emphasis added and citation omitted). Accordingly, we find the jury was justified in concluding that Merritt was engaged in a conspiracy to possess ecstasy with the intent to distribute it.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

Humphreys, J., with whom Elder and Alston, JJ. join, dissenting.

I agree with the majority's general proposition that if Glen Patrick Merritt ("Merritt") was the "muscle" or "enforcer" for the drug dealers he associated with in this case, the evidence might arguably be sufficient to support the conclusion that he was aiding and abetting in the possession with the intent to distribute, transportation with the intent to distribute, and conspiracy to distribute the ecstasy. However, I respectfully dissent from the majority's holding that the evidence was sufficient as a matter of law to convict Merritt solely on the theory that he was aware of the contents of the suitcase based upon the sheer speculation and suspicion of police officers that he acted in a role of "lookout," "enforcer," or the "muscle," safeguarding the transportation of the drug ecstasy into the Commonwealth. McMorris v. Commonwealth, 276 Va. 500, 506, 666 S.E.2d 348, 351 (2008) ("[T]o sustain a criminal conviction, the Commonwealth is required to prove more than a suspicion of guilt or probability of guilt." (citation omitted)).

Simply being present when a crime occurs does not subject one to criminal liability. The gravamen of being a principal in the second degree to the criminal acts of others is either actually or constructively aiding and abetting in the commission of the crime. Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 32-33 (2005) ("'A principal in the second degree, or an aider or abettor as he is sometimes termed, is one who is present, actually or constructively, assisting the perpetrator in the commission of the crime. . . . The test is whether or not he was encouraging, inciting, or in some manner offering aid in the commission of the crime. If he was present lending countenance, or otherwise aiding while another did the act, he is an aider and abettor or principal in the second degree.'" (quoting Jones v. Commonwealth, 208 Va. 370, 372-73, 157 S.E.2d 907, 909 (1967))). The majority holds that a reasonable jury could infer from both circumstantial and direct evidence that Merritt aided in the commission of these

- 16 -

crimes by being the "enforcer" or the "muscle" in the drug transaction. However, the record in this case is bereft of any circumstantial or direct evidence that would support a fact finder's rational conclusion, without resorting to speculation, that Merritt provided any such assistance by protecting McDaniels and Spratley who possessed and transported the drugs in the suitcase and that he conspired to distribute the drugs. While a fact finder is entitled to draw reasonable inferences from proven facts, "all circumstances proved must be consistent with guilt and inconsistent with innocence and exclude all reasonable conclusions inconsistent with guilt." McMorris, 276 Va. at 506, 666 S.E.2d at 351 (citations omitted). Two police experts testified at trial regarding the role of the "muscle" or "enforcer" in a drug transaction. Detective Massetti testified that the individual is typically bigger physically or armed in order to protect the product or the distributor. Massetti further provided that in scenarios like this, it is typical "for them to use . . . a large guy who's armed," as the "muscle," "and his job is to keep an eye out and make sure nothing negative happens." According to Detective Fowler, the primary purpose of the "enforcer" or "lookout" is to protect the product or the distributor to ensure that the transaction goes smoothly, while his secondary purpose is to accept or "chase[] down" payments for the drugs. In addition, Fowler stated that the "enforcer" is often willing to carry a firearm or some other weapon, and he is not afraid to use it because of his primary purpose. Fowler further stated that in his opinion, based on his training and experience, the transaction in this case was a drug transaction; and Massetti opined that, based on his observations as an expert and the facts of what occurred that evening, Merritt "was clearly the muscle in this." However, the evidence in the record does not support Massetti's opinion, nor does it support the inferences drawn from the speculations and suspicions implicit in Fowler's testimony.

The evidence fails to show that Merritt meets the physical description provided by either expert witness regarding requisite physical attributes of an "enforcer" or "muscle" of a criminal

group.  There is no evidence in the record that Merritt was bigger than average physically, nor is there any evidence regarding the stature of the other individuals in the drug transaction from which a jury could reasonably conclude that Merritt was clearly the "muscle" due to his physique.  In addition, there is no evidence that he was armed with a firearm or other weapon suitable either for protecting his associates or for "chas[ing] down" payments from recalcitrant consumers during the time in question.  The only weapon found on Merritt was a small penknife that was part of his belt buckle.  With regard to the gun found in the vehicle, Bolton was the one who informed the officers of its presence and location, and he claimed ownership of it.  While the majority contends that a jury could reasonably infer that because Merritt was sitting in the passenger seat close to the location of the gun and magazine, he may have had it on his person while he was in the parking lot; yet, far from constituting a reasonable inference, this speculation by the majority is unsupported by any evidence in the record and is a good example of the sandy foundation upon which the Commonwealth's case against Merritt was built.  It is just as easy to speculate that the gun and magazine were never on Merritt's person or that he actually had no knowledge of their presence in the vehicle.  The location of the gun in the console and the magazine in the glove compartment does nothing to bolster the majority's contention that Merritt had access to the firearm, necessarily knew about its presence in the vehicle, or that he had it on his person in the parking lot before he returned to the vehicle.

It is certainly a possibility that Merritt was involved as a principal in the illegal activities of his associates but that possibility is legally insufficient for a conviction, and neither is guilt by association a substitute for evidence that establishes involvement in a criminal enterprise beyond a reasonable doubt.  Even viewing the facts contained in this record in the light most favorable to the Commonwealth, without resorting to the sheerest compound speculation, the evidence does not lead only to the logical inference that Merritt was there to protect Bolton, McDaniels,

Spratley, and the ecstasy. Merritt arrived at the bus depot with Bolton, got out of the vehicle, and stood at various positions in the parking lot while holding a cell phone to his ear without talking into it or changing facial expressions. During his sojourn in the parking lot, Merritt remained attentive, and continuously scanned the parking lot, and, according to the officers, followed and shadowed McDaniels and Spratley. The officers testified that Merritt's actions were similar to those of a surveillance officer protecting the safety of an undercover officer.

Merritt then walked fifteen to thirty feet behind McDaniels and Spratley as they walked towards the Lexus, thus turning his back to the bus and those standing around it. When they loaded the suitcase into the trunk, Merritt stood a short distance behind the vehicle and continued to scan the parking lot. Merritt never acknowledged McDaniels and Spratley, nor did he touch the suitcase containing the drugs. After everyone entered the vehicle, Merritt returned to the passenger seat. In looking at Merritt's actions during his time in the parking lot, while it is certainly reasonable to suspect Merritt's involvement in his associates' activities, the evidence simply does not rise to the level of circumstantially demonstrating beyond a reasonable doubt that Merritt aided and abetted his companions as the "muscle" or "lookout" of the group.

In addition, there is no direct evidence linking Merritt to the actual drug transaction. The only direct evidence regarding Merritt is the Western Union receipt noting that Bolton sent him $125 in New York City a few days prior to the date in question. While Fowler testified as an expert as to various possible reasons for the money, Fowler admitted that he ultimately had no idea what it was for. All the other evidence is purely circumstantial in nature, and even in its totality, does not exclude all reasonable conclusions inconsistent with guilt. With regard to the cell phones, the record merely reflects that there were phone calls made between the phones found on Merritt and McDaniels and Bolton, but it does not establish to whom the phone numbers were registered or what the phone calls were regarding. In addition, the fact that the

- 19 -

number of one of the cell phones found on Merritt is designated as "G Money" in Bolton's phone provides nothing more than a postulation that Bolton actually referred to Merritt by that alias in any interaction with him. Further, the lack of evidence regarding the notation "GMNY 1000" in the notebook does nothing except provide a vehicle for the speculation engaged in by the majority as to what that reference means. There is no evidence in the record that the phones found on Merritt actually belonged to him, or that the drug notebook belonged to Bolton such that the notation "GMNY 1000" could only mean "G Money" and thus referred solely to Merritt.

While the location and condition of the plastic baggie corner was consistent with it having recently fallen out of the vehicle's passenger door, the record is devoid of any evidence that the only logical inference is that the baggie was in Merritt's possession before it fell out of the car. The plastic baggie corner was, according to Fowler's testimony regarding the packaging of drugs, consistent with drugs packaged for personal use, and no latent fingerprints were obtained from it linking it to Merritt. In addition, there is no evidence regarding the owner of the drug notebook found in the back seat by Bolton. Neither the four bus tickets for transportation between Norfolk and New York nor the receipt for the large number of baggies found in the back seat contain any indication of who made the purchases.

The majority contends, "the only logical inference from this evidence is that Merritt was acting as a lookout while McDaniels and Spratley transported the drugs through the parking lot." Yet, while it may be logical to *suspect* Merritt's involvement, that is not the only logical inference supported by the evidence in this record. If we resist the temptation to speculate and just consider whether the evidence points inexorably toward guilt, two conclusions quickly emerge. First, as "enforcers" go, Merritt would not have been able to provide much in the way of protection because the only weapon found on him was the small penknife in his belt, he was walking fifteen to thirty feet behind McDaniels and Spratley with his back to the bus and the rest

of the parking lot, and he proceeded to stand behind the vehicle several feet away from where the gun and its separate magazine were located in the glove compartment and center console of the vehicle while the others loaded the suitcase into the trunk. Second, the Western Union receipt merely shows that Merritt was in New York days before the arrest and that he received only $125 – a sum that hardly seems consistent with payment for involvement in a major drug transaction as intricate as that described by the expert witnesses who testified in this case. In looking at the totality of the evidence presented by this record, I find it legally insufficient to prove more than a suspicion that Merritt was aiding and abetting as the "muscle" or "enforcer" of the drug transaction and thus was a principal in the second degree to his associates' criminal activities. The evidence when viewed in the light most favorable to the Commonwealth does not "exclude all reasonable conclusions inconsistent with guilt." McMorris, 276 Va. at 506, 666 S.E.2d at 351 (citations omitted).

Because I would hold that the evidence presented was not sufficient to negate every reasonable hypothesis consistent with innocence, I would hold that the trial court erred in letting the jury determine whether Merritt was guilty of aiding and abetting in the possession of ecstasy with the intent to distribute, transportation of ecstasy with intent to distribute, and conspiracy to distribute ecstasy. Thus, I would reverse the convictions and dismiss the indictment.