COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Kelsey and Powell
Argued at Richmond, Virginia


FREDERICKSBURG DEPARTMENT
 OF SOCIAL SERVICES
                                            MEMORANDUM OPINION[*] BY
v.       Record No. 2174-10-2              JUDGE CLEO E. POWELL
                                            AUGUST 2, 2011
ZASKECHA WASHINGTON


          FROM THE CIRCUIT COURT OF THE CITY OF FREDERICKSBURG
                           Gordon F. Willis, Judge

               Joseph A. Vance, IV, for appellant.

               Robert J. Barlow (Melissa K. McCreary; Law Offices of Robert J.
               Barlow, PLC, on brief), for appellee.

               (Sonya B. Costanzo, on brief), Guardian *ad litem* for the infant
               children.


        On September 22, 2010, the trial court denied the petitions filed by Fredericksburg

Department of Social Services ("DSS") to terminate the residual parental rights, pursuant to

Code § 16.1-283(C), of Zaskecha Washington ("mother") to her children, A.W., I.W., Y.L., and

J.L..  On appeal, DSS argues that the trial court erred in finding that DSS failed to meet its

burden under Code § 16.1-283 to support the petitions to terminate the mother's parental rights

to the four children who were the subject of this case.  DSS also asserts that trial court erred by

"disregarding the uncontradicted expert testimony of Dr. Whelan."  We affirm the trial court's

decision for the reasons that follow.

---

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

I.  BACKGROUND

Mother's four children were removed from her home in February of 2008.  DSS filed petitions to terminate mother's parental rights, but the Circuit Court for the City of Fredericksburg denied these petitions in August 2009.  In October 2009, the DSS formulated a new plan with the goal of returning the children to the home.

On February 5, 2010, DSS again filed petitions to terminate the parental rights of mother.  On May 13, 2010, the Juvenile and Domestic Relations District Court for the City of Fredericksburg granted these petitions.  Mother appealed that decision to the circuit court.

At that *de novo* hearing, DSS called an expert, Dr. William F. Whelan, a clinical psychologist, who testified that he evaluated the child-parent bond between mother and the four children at the request of DSS.  He determined that Y.L. exhibited very little attachment to mother and that she showed a "significant amount of adversive behavior" toward her mother.  Dr. Whelan reported that Y.L. "looked anxious, unhappy, and even mildly weary of interacting with her mother."  He testified that this type of behavior is not present in an average, healthy relationship.  Mother showed little evidence of being able to change Y.L.'s behavior.

As to J.L., Dr. Whelan testified that "[h]e showed a mix of anxious inhibition of his needs and feelings . . . ."  Mother was unable to help him when he was overaroused, and he showed a tendency to try to control the relationship with mother by moving into the role of a peer.  Mother was interested in interacting with J.L. but "her interactions were typically insensitive and they weren't very effective."

Dr. Whelan described I.W.'s behavior as showing

> evidence of an attachment to her mother, also largely outside of the average range.  And [I.W.] showed a mix of similar kind of controlling behavior, although more pronounced in some ways than [J.L.], and also moments of strong arousal and

disorganization, some mild sexualized behavior as well, which is very unusual to see in our clinic but does happen now and then.

He stated that I.W. also looked at her mother as a peer.

As to A.W., Dr. Whelan characterized his behavior as having

[v]ery little evidence of attachment behavior, although what looks like a residue that my guess would be that there may have been more of an attachment when he was younger, but the attachment patterns that he showed also include this strong inhibition of emotions and his own needs. Again, more of this controlling caregiving behavior and then emotional disengagement where he stayed so much to himself and really had very little emotional interactions with his mother.

Dr. Whelan opined that there was not a good fit between mother's parenting abilities and the children's needs. Dr. Whelan noted that the children could form healthy relationships with others, just not their mother. Dr. Whelan admitted upon questioning by the court that he did not examine the relationships between the siblings.

Laurel Purchase, a licensed clinical social worker, was asked by DSS to investigate whether there was bonding between the mother and children and how mother performed as a parent. At the time of this evaluation, the children were already in foster care. Purchase testified that mother told her that she didn't trust people so she kept the children home. Mother stated to Purchase that she did not believe in a lot of structure so the children did not do chores and they watched a lot of television, including "Law & Order" and "SVU." Purchase testified that when she observed the children, they played independently of each other.

[T]hey didn't really play together. Each one was doing their own thing, and their anxiety began to grow to the point that, again, they weren't listening to her at all. She would get one to sit down and another one would start to running around the table. Or when one of them went to the bathroom, they all went to the bathroom and wouldn't come out of the bathroom, and she would call in and ask them to come out. They wouldn't listen to her. They wouldn't obey her at all.

When her children wouldn't listen or behave, mother became withdrawn, quiet, and stopped trying.

Mother testified that she was currently employed for 40 hours per week making $300 per week. She said that she left her previous job for her current one because it offered her more hours and she was able to make more money. Mother also testified that she renewed her lease in September and pays $9 per month for rent. Mother provided the court with pictures of her and her children celebrating a belated Christmas. She also provided the court with a letter I.W. wrote telling her mother that she loved her and a picture she drew of the family at Christmas. She also submitted a certificate from a parenting class that she completed. Mother further testified that she was in group therapy and saw a psychiatrist monthly.

With regard to Dr. Whelan's observation of her interaction with her children, mother explained that it was awkward interacting with Y.L. in front of Dr. Whelan because Y.L. was taken away from her when she was one and mother had not seen her in almost a year. She stated, however, that Y.L. did hug and kiss her. Mother said that I.W. wanted to go home with her. She said that A.W. told her about his new school, that students teased him, and that she tried to give him advice on how to handle the situation.

As to some of the allegations in Purchase's report, mother denied allowing her kids to watch "Law & Order" and stated that it was the father of the two oldest children who allowed them to do that and she told him not to allow it. She said that she allowed them to watch Sprouts, Barney, and Elmo and that Nick Jr. was too adult in some ways so she did not let them watch it.

Finally, mother said that she was looking forward to supervised or therapeutic visitations with the children and would do anything to get them back. She also testified that the father of the two youngest children, who was released from prison in February of 2010, is her fiancé, and

they plan on getting married. She stated that they had not set a date yet because they were focused on getting the children back. Mother also stated that the father of the two youngest children was working a good job, but he might lose that job within the month.

After the parties presented evidence at the hearing *ore tenus*, the circuit court asked DSS 1) how, if it limited her visitations with the children, could she be faulted for any lack of attachment, and 2) weren't the petitions to terminate her parental rights filed just two days after she filed a motion seeking more visitation with her children? The court also noted that the photograph of mother with the four children demonstrated family bonding.

In its order, the court held that it did "not find by clear and convincing evidence that the termination of [mother's] parental rights is in the best interest of the children at this time, and the [c]ourt further finds that [mother] has not, without good cause, been unwilling or unable, within a reasonable period of time, to substantially remedy the conditions which led to the children being placed in foster care or the continuation of being placed in foster care." Therefore, the court denied DSS's petitions for the termination of mother's parental rights and denied DSS's request to approve the foster care plans for the children with the goal of adoption. The court approved mother's request for individual visits with her children.

## II. ANALYSIS

> "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (citations omitted). Where the trial court hears the evidence ore tenus, its decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it. See Lowe v. Dep't of Pub. Welfare, 231 Va. 277, 282, 343 S.E.2d 70, 73 (1986) (citation omitted).

Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 336, 544 S.E.2d 890, 893-94 (2001). "Where a trial court makes a determination which is adequately supported by the record,

the determination must be affirmed." Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 796 (1990).

The petitions to terminate mother's parental rights were made under Code § 16.1-283(C). Based on the findings and holding of the trial court, it is clear that the determination whether to terminate mother's parental rights was made under Code § 16.1-283(C)(2). Pursuant to that code section, a trial court may terminate the rights of a parent to a child upon clear and convincing evidence that it is in the best interests of the child and that the parent

> without good cause, [has] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2). Decisions to terminate parental rights under Code § 16.1-283(C)

> hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes. Considerably more "retrospective in nature," subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005) (citation omitted).

DSS first argues that the trial court erred in finding that DSS failed to meet its burden under Code § 16.1-283 to support the petitions to terminate the mother's parental rights. Specifically, DSS contends that mother exceeded the twelve months allowed by statute without substantially remedying the conditions that led to the children being placed in foster care.

It is well settled that

> [t]he best interest of the child is the paramount consideration in cases involving the termination of a parent's residual parental

rights. Logan v. Fairfax County Dep't of Human Dev., 13
Va. App. 123, 128, 409 S.E.2d 460, 463 (1991). Nevertheless,
"'the rights of parents may not be lightly severed but are to be
respected if at all consonant with the best interests of the child.'"
Ward v. Faw, 219 Va. 1120, 1124, 253 S.E.2d 658, 661 (1979)
(quoting Malpass v. Morgan, 213 Va. 393, 400, 192 S.E.2d 794,
799 (1972)). In considering the matter before us, we must have a
"respect for the natural bond between children and their natural
parents. The preservation of the family, and in particular the
parent-child relationship, is an important goal for not only the
parents but also government itself. . . . Statutes terminating the
legal relationship between parent and child should be interpreted
consistently with the governmental objective of preserving, when
possible, the parent-child relationship."

Richmond Dep't of Soc. Servs. v. L.P., 35 Va. App. 573, 580, 546 S.E.2d 749, 752-53 (2001)

(quoting Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695

(1980)). "The termination of parental rights is a grave, drastic, and irreversible action. When a

court orders termination of parental rights, the ties between the parent and child are severed

forever, and the parent becomes 'a legal stranger to the child.'" Lowe v. Dep't of Pub. Welfare

of City of Richmond, 231 Va. 277, 280, 343 S.E.2d 70, 72 (1986) (quoting Shank v. Dep't of

Soc. Servs., 217 Va. 506, 509, 230 S.E.2d 454, 457 (1976)).

The twelve-month time limit established by Code § 16.1-283(C)(2)
was designed to prevent an indeterminate state of foster care
"drift" and to encourage timeliness by the courts and social
services in addressing the circumstances that resulted in the foster
care placement. "This provision protects the family unit and
attendant rights of both parents and child, while assuring resolution
of the parent/child relationship without interminable delay."
Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995).
The legislation established a reasonably presumptive time frame of
twelve months for parents to receive rehabilitative services to
enable them to correct the conditions that led to foster care
placement. "The statute clearly contemplates that efforts to resolve
the 'conditions' relevant to termination are constrained by time."
Id. If the parent fails to substantially remedy those conditions
within twelve months the court may act to prevent the child from
lingering in foster care. "Absent 'good cause,' a parent or parents
receiving the 'reasonable and appropriate' services of
'rehabilitative agencies' must 'remedy substantially' the

'conditions which led to . . . foster care' of the child in a 'reasonable period not to exceed twelve months.'" Id.

The time limit does not, however, temporally restrict the trial court's consideration to events that occurred between the parent and child only during that discrete twelve-month time period to the exclusion of what may have occurred before and after those dates. See Heide, 35 Va. App. at 337, 544 S.E.2d at 894.

L.G. v. Amherst Cnty. Dep't of Soc. Servs., 41 Va. App. 51, 56-57, 581 S.E.2d 886, 889 (2003).

To construe the statute in such a way

"would deny the fact finder the opportunity to evaluate the present best interests of the child. The trial court may discount the parent's current 'progress' if the best interests of the child would be served by termination. However, . . . the trial court may determine that a parent's delayed, but nonetheless substantial, progress may overcome the time delay. We will not deprive the trial court of the opportunity to weigh the rights of the parents and the best interests of the child."

Id. at 57, 581 S.E.2d at 889-90 (quoting Heide, 35 Va. App. at 337, 544 S.E.2d at 894).

Here, the time in which mother's children have been in foster care has exceeded one year. That said, there is evidence in the record to support the trial court's finding that she was making progress and that it was not in the best interests of the children to terminate her parental rights. Specifically, DSS's primary argument that it was in the best interests of the children to terminate mother's parental rights was that the children were not appropriately attached to mother. In support of this argument, DSS relied heavily on Dr. Whelan's report. The court directly questioned DSS about how the mother and children were to form an attachment when DSS limited her visitation with the children. The court also pointed out that Dr. Whelan's report was based on forty-minute observations of mother with each her four children. To counter Dr. Whelan's report, mother introduced into evidence a certificate of completion from a parenting class, a letter I.W. wrote telling her mother that she loved her, and a photograph of mother with her four children that was taken during a visitation. There was also evidence that

mother had petitioned the juvenile court for increased visitation with her children. She testified that she was looking forward to supervised visitation with her children and would do anything to get them back. Contrary to DSS's argument, which was focused on the evidence regarding the attachment between mother and the children, there was significant evidence that mother had done everything else DSS had requested. Specifically, mother was employed, had a stable residence, had completed at least two parenting classes, was in group therapy, and kept regular appointments with her psychiatrist. The trial court accepted this testimony.

> We may not "'substitute our judgment for that of the trier of fact,'" Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002) (quoting Commonwealth v. Presley, 256 Va. 465, 466, 507 S.E.2d 72, 72 (1998)), nor may we "reweigh the evidence," Nusbaum v. Berlin, 273 Va. 385, 408, 641 S.E.2d 494, 507 (2007), because we have no authority "to preside *de novo* over a second trial," Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004).

Merritt v. Commonwealth, 57 Va. App. 542, 555, 704 S.E.2d 158, 165 (2011). Thus, it cannot be said that the trial court's determinations that mother was making sufficient progress and that it was not in the children's best interest to terminate mother's parental rights are without evidence to support them.

DSS next asserts that the trial court erred by "disregarding the uncontradicted expert testimony of Dr. Whelan." Dr. Whelan's testimony, however, was contradicted in many respects by mother's testimony.

> It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony. Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). Further, the fact finder is not required to accept the testimony of an expert witness merely because he or she has qualified as an expert. McLane v. Commonwealth, 202 Va. 197, 205-06, 116 S.E.2d 274, 281 (1960). In determining the weight to be given the testimony of an expert witness, the fact finder may consider the basis for the expert's opinion. Gilbert v. Summers, 240 Va. 155, 393 S.E.2d 213 (1990).

Street v. Street, 25 Va. App. 380, 387, 488 S.E.2d 665, 668-69 (1997).  The trial court, being in the position to judge the demeanor of the witnesses on the stand, was entitled to weigh mother's testimony more heavily than it weighed Dr. Whelan's testimony.  Thus, this assignment of error is without merit.

## III.  CONCLUSION

For the foregoing reasons, we affirm.

Affirmed.